NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WRIGHT LINE, A DIVISION OF
WRIGHT LINE, INC.,
Respondent.

No. 80–1721.

United States Court of Appeals,
First Circuit.

Argued April 8, 1981.

Decided Sept. 21, 1981.

Joseph A. Schwachter, Pittsburgh, Pa.,
with whom William A. Lubbers, Gen. Coun-

sel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Washington, D.C., were on brief, for petitioner.

William H. DuRoss, III, Washington, D.C., with whom Gerard C. Smetana, Kovar & Smetana, Chicago, Ill., and Julius Kirle, Boston, Mass., were on brief, for respondent.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Bernard Lamoureux, an activist in the Teamsters' two unsuccessful campaigns to organize Wright Line's employees, was discharged from his job as a shop inspector, ostensibly because he submitted an inaccurate record of the times at which he performed inspections on December 29, 1977. Upon Lamoureux's complaint, the Board found that Wright Line had discharged him because of his union activity, in violation of section 8(a)(3) of the National Labor Relations Act. The Board ordered Wright Line to reinstate Lamoureux with back pay. We enforce the Board's order.

## I.

Wright Line manufactures computer storage products to the specifications of customers, including government agencies. Lamoureux began working for Wright Line in 1966 and, with the exception of a period between 1971 and 1973, was employed there continuously until his discharge on December 30, 1977. The Board found, with substantial record support, that Lamoureux's work, throughout this period until December 29, 1977 was satisfactory or better. For the last two years of his employment, he worked in the company's Inspection Department, inspecting completed parts for quality and conformity to specifications. This position required that he keep records on two forms: the Inspection Report, which stayed with the blueprint for the inspected part, and the Daily Activity Sheet, on which

he recorded the time of each inspection and which he submitted to his supervisor after each day's work.

In 1976, Lamoureux contacted Teamsters Local 170 and initiated an organizational drive among Wright Line's employees. The Board supportably found that Lamoureux was visibly active in the union campaign. An election was held on August 27, 1976, and Lamoureux served as an alternative observer for the union, which lost the election. A second campaign was conducted in the fall of 1977, and Lamoureux was again active. An election was held on October 20, 1977; the union lost again. The Board supportably found that Wright Line management conducted an aggressive (although not necessarily unlawful) campaign against the union, and that management was well aware of Lamoureux's activism, certain supervisors having made "gratuitous remarks" to him about it.

The Board found, on the basis of substantial evidence, that Lamoureux's discharge occurred as follows: on the morning of December 29, 1977, Plant Superintendent Southard asked Supervisor Forte to check on Lamoureux, reporting that he had seen Lamoureux entering the men's room carrying a newspaper. Forte went to Lamoureux's two assigned departments and walked between them until Lamoureux appeared some 35 minutes later. Forte then returned to his office, saying nothing to Lamoureux, and noted the times of Lamoureux's absence. Forte had made no attempt to locate Lamoureux, neither looking in the men's room nor using the plant's page system, although Lamoureux's job included several tasks which would require him to leave his departments for short periods. Later the same day, Forte had occasion to be in Lamoureux's department and did not find him there. About 30 minutes later he found Lamoureux at a workbench inspecting a part. Forte again made a record of the incident but did not ask Lamoureux to explain.

The next morning, Forte checked Lamoureux's Daily Activity Sheet and noted Lamoureux's report that he had made sev-

eral inspections during the time when Forte had failed to find him in his departments. Forte presented this information to his own supervisor, who stated that this indicated a "dischargeable offense." The two consulted higher officials, who told them that they "could discharge" Lamoureux if his account substantiated the charge. Forte prepared a written report of the incident, had Lamoureux's final paycheck prepared, and then summoned Lamoureux to a meeting with himself and two others. Confronted with the charge, Lamoureux admitted that "the times weren't accurate and they never were," stating that "if you want them right to the second, I can put them right to the second," and asserting that the real reason for the confrontation was his union activity. The supervisors denied this charge and discharged Lamoureux, saying that they no longer considered him trustworthy.[1]

## II.

Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), provides that,

(a) It shall be an unfair labor practice for an employer

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

This provision is supplemented by section 10(c) of the Act, 29 U.S.C. § 160(c), which authorizes the Board to take remedial action, with the following limitation:

No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any backpay, if such individual was suspended or discharged for cause.

■ Section 8(a)(3) imposes a prohibition on employers which is simple to state but often difficult to apply in practice: they may not discharge an employee because of his union activity; but they may and should apply their usual rules and disciplinary standards to a union activist just as they would to any other employee. Hence, in a given discharge case it must be decided whether the employer acted because of the employee's union affiliation, or whether he acted because of some factor unrelated to the employee's union status. *Local 357, International Brotherhood of Teamsters v. NLRB*, 365 U.S. 667, 675, 81 S.Ct. 835, 839, 6 L.Ed.2d 11 (1961) (test is "true purpose" or "real motive").

Often, of course, there are competing explanations of why an employee was fired. Board counsel will point to evidence of anti-union motivation. The employer will cite some instance of misconduct and will deny having been motivated by any other consideration. In such a situation, the Board needs to determine not only whether the asserted misconduct occurred, but whether, even so, it effectively produced the discharge. The employer will doubtless lose if the asserted misconduct is shown not to have occurred. But suppose it occurred? In such event, Board counsel will argue that it was insufficient cause for discharge—that a non-activist would have been retained notwithstanding the offense. The employer, on the other hand, will deny this, and will insist, moreover, on his right, as the employer, to determine what conduct is or is not acceptable.

The Board's approach to these cases—sometimes, although without complete accuracy, termed "mixed motive" cases—has been the source of a continuing controversy among the circuits and between the Board and this court. In the present case, the Board has taken a new approach. Relying on *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and precedent from this circuit, the Board announced the following rule: general counsel must first "make a *prima facie* showing sufficient to support the inference that [the employer's opposition to] protected conduct was a 'mo-

---

**1.** The Wright Line managers did not then and do not now contend that Lamoureux did not actually perform any of the inspections he reported. Their complaint was and is only that he "falsified" his report of the timing of his inspections.

tivating factor' in the employer's [discharge] decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." 251 NLRB No. 150, at 20–21. Applying that test here, the Board found that the prima facie case had been made and that Wright Line failed to prove that it would have taken the same action regardless of Lamoureux's union activity. Wright Line challenges the Board's new approach and its application here as contrary to the provisions of the statute and beyond the powers of the Board in that it places the burden of persuasion on the employer. We are thus called upon to pass on the validity of the Board's new rule as well as on its application to this record.[2]

We start by observing that the Board's new rule seems better than its old one. Previously the Board would find a violation of section 8(a)(3) and order reinstatement whenever it concluded that the discharge was even partially motivated by opposition to union membership. Under this approach, a discharge was improper even if it would have occurred absent the illegal motivation, e. g., the employee may have committed an infraction so serious that any employee—union or non-union—would have been fired. This partial motivation test—as the Board now acknowledges—placed "the union activist in an almost impregnable position once [anti-]union animus has been established." Activists could not be discharged for conduct that would be unforgivable in the case of another employee. The result was to immunize union activists against legitimate discipline for genuine offenses and to deprive employers of the freedom to apply their own rules uniformly to all their employees. See NLRB v. Wilson Freight Co., 604 F.2d 712 (1st Cir. 1979); NLRB v. Eastern Smelting & Refining Corp., 598 F.2d 666 (1st Cir. 1979); Liberty Mutual Insurance Co. v. NLRB, 592 F.2d 595 (1st

Cir. 1979); Hubbard Regional Hospital v. NLRB, 579 F.2d 1251 (1st Cir. 1978); NLRB v. Rich's of Plymouth, Inc., 578 F.2d 880 (1st. Cir. 1978); Stone & Webster Engineering Co. v. NLRB, 536 F.2d 461 (1st Cir. 1976); NLRB v. Fibers International Corp., 439 F.2d 1311 (1st Cir. 1971); NLRB v. Billen Shoe Co., 397 F.2d 801 (1st Cir. 1968); NLRB v. Lowell Sun Publishing Co., 320 F.2d 835 (1st Cir. 1963).

In response to the Board's handling of these cases, we have repeatedly urged the Board to go beyond the employer's obvious wish to be rid of an activist and to inquire into the question of actual cause, giving serious consideration to the employer's legitimate business reasons for discharging the employee. See, e. g., NLRB v. Lowell Sun, 320 F.2d at 841 (Aldrich, J., concurring) (employer's knowledge that discharge will have pleasing result not to be confused with actuating motive). We have expressed this concern by insisting that the Board find the protected activity to be the "dominant motive" for the discharge. See, e. g., NLRB v. Fibers International, 439 F.2d 1311; NLRB v. Lowell Sun, 320 F.2d 835 (Aldrich, J., concurring); NLRB v. Whitin Machine Works, 204 F.2d 883, 885 (1st Cir. 1953) (reinstatement warranted if protected activity "weighed more heavily" than other factors); and cases cited in these opinions. Elaborating on the meaning of this test, we have held that the Board may order reinstatement only after finding that the discharge would not have occurred in the absence of the protected activity. NLRB v. Fibers International, 439 F.2d at 1312 n.1 & 1315.

■ The Supreme Court's decision in Mt. Healthy v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471, followed by Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), seemed to us to lend strong support to our analysis in the Fibers International case.

2. Our review of the Board's factual findings is limited to determining whether they are supported by substantial evidence. 29 U.S.C. § 160(e). But the Board's adoption of the Mt. Healthy test, to the extent that it establishes a new standard or set of legal presumptions, is a ruling of law which we review for legal error, giving due deference to the Board's expertise in interpreting the act it administers.

In cases since *Mt. Healthy*, we have relied on its expression of the "but for" standard, abandoning our earlier "dominant motive" language. *Statler Industries, Inc. v. NLRB*, 644 F.2d 902 (1st Cir. 1981); *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 (1st Cir. 1979); *Coletti's Furniture, Inc. v. NLRB*, 550 F.2d 1292 (1st Cir. 1977). We came to recognize that the existence or not of a causal link between union activity and the employee's injury—or, as section 8(a)(3) puts it, the existence of antiunion "discrimination in regard to hire or tenure of employment"—was most accurately determined by asking whether the discharge would have occurred "but for" the protected activity. If the discharge would have occurred *absent* the protected activity, it is clear no unfair practice existed since a bad motive without effect is no more an unfair labor practice than an unexecuted evil intent is a crime. While *Mt. Healthy* involved employee activity protected by the Constitution rather than by the NLRA, it presented issues of causation, harm and remedy very similar to those raised in the labor context, and the Court expressed the same concerns that we have voiced in labor cases.[3] The lower court in *Mt. Healthy*, like the Board in past labor cases, had ordered reinstatement on a finding that the protected activity was one of two reasons for the decision to discharge the employee. The Court's dissatisfaction with this result was exactly what ours had been: that the employee who engaged in protected conduct would thereby be placed in a better position than he would have held if he had not done so, and his employer's freedom to apply legitimate performance standards would be impaired by the activist's favored position. *Id.*, 429 U.S. at 285–87, 97 S.Ct. at 575–76. To avoid these results while protecting the employee's rights, the Court ruled that reinstatement should be ordered only upon a finding that the employee would not have been discharged but for the protected conduct. In labor cases, as in constitutional cases, we think the "but for" test is the correct substantive standard for evaluating the propriety of a reinstatement order.[4]

Wright Line does not appear to quarrel with this substantive test. Its challenge is to the Board's apparent adoption of *Mt. Healthy's* allocation of the burdens of proof. *Mt. Healthy* held that once the plaintiff had shown his protected activity to have been a "substantial" or "motivating" factor, "the court should have gone on to determine whether the Board [of Education] had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Id.*, 429 U.S. at 287, 97 S.Ct. at 576. *See also Givhan v. Western Line*, 439 U.S. at 416, 99 S.Ct. at 697. Wright Line contends, citing section 10(c) of the National Labor Relations Act,[5] the Board's regulation 101.-10(b),[6] and section 7(c) of the Administrative Procedure Act,[7] that the Board lacks authority to place any burden of proof on the employer. Wright Line argues that

---

**3.** For discussion of the analogy between *Mt. Healthy* and section 8(a)(3) cases, see Michael S. Wolly, "What Hath *Mt. Healthy* Wrought," 41 Ohio State L.J. 385–99 (1980); and William H. DuRoss, "Toward Rationality in Discriminatory Discharge Cases: The Impact of *Mt. Healthy Board of Education v. Doyle* Upon the NLRA," 66 Georgetown L.J. 1109 (1978).

**4.** We have applied the same substantive test to evaluate a claim for reinstatement by an employee allegedly discharged in violation of the Age Discrimination in Employment Act. *Loeb v. Textron*, 600 F.2d 1003, 1019 (1st Cir. 1979).

**5.** Section 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), provides in part:

If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint.

**6.** 29 C.F.R. § 101.10(b) provides in part:

The Board's attorney has the burden of proof of violations of section 8 of the National Labor Relations Act.

**7.** Section 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556, provides in part that "Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof."

these provisions require the Board to prove the employer's guilt by a preponderance of the evidence, and that the Board's burden-shifting approach instead requires the employer to prove his innocence.

██ We have no difficulty accepting the Board's formulation that *some* kind of a "burden" devolves upon the employer once the general counsel has made a prima facie showing that protected conduct was a motivating or substantial factor in the discharge decision. 251 NLRB No. 150, at 20–21. Indeed, in *Statler Industries v. NLRB*, this court approved the general causation analysis expressed in the Board's Wright Line opinion. 644 F.2d at 905. On further reflection, however, we disagree with the Board on the narrow issue of defining the exact nature of the burden which the employer thus acquires. Section 10(c), as well as the Board's own regulation, make clear that the general counsel must prove the employer's guilt by a preponderance of the

evidence to warrant a finding that an unfair labor practice has occurred.[8] We think the only burden which may be acceptably placed on the employer is a "burden of production," that is a burden of coming forward with credible evidence to rebut or meet the general counsel's prima facie case. This, in effect,. is the position we took recently in other cases although without actually characterizing the employer's burden as one of "production" rather than "persuasion." *NLRB v. Amber Delivery Service*, 651 F.2d 57 (1st Cir. 1981); *NLRB v. Cable Vision*, 660 F.2d 1 (1st Cir. 1981). We said in those cases that once the general counsel has established a basis for finding an improper motive, the employer must merely, "come forward with enough evidence to convince the trier of fact that, under the circumstances, there is no longer a preponderance of evidence establishing a violation." *NLRB v. Amber Delivery Service*, 651 F.2d at 69; *NLRB v. Cable Vision*, 660 F.2d at 8.

**8.** The Board relied on *NLRB v. Great Dane Trailers*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), in which the Court held that "once it has been proved that the employer engaged in discriminatory conduct which would have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." *Id.*, at 34, 87 S.Ct. at 1797. *Great Dane*, which involved a challenge to an overall policy of the employer rather than to a single discharge, is inapposite here. Where an overall policy concededly does discriminate against protected activity, the Board must balance the employer's justification against the employee's interest, and it may fairly require the employer to demonstrate the genuineness and strength of its asserted business reason. But here the issue is whether the discharge was in fact discriminatory—whether it was caused by protected activity or whether some other factor was operative. *Great Dane* has no application. *See* L. Janofsky, "New Concepts in Interference and Discrimination under the NLRA," 70 Colum.L.Rev. 81, 96 (1970).
The Board also invokes the portion of section 10(c) quoted at the beginning of this section, regarding discharges for cause, citing Congress' rejection, in drafting this provision, of proposed language barring reinstatement unless the "weight of the evidence shows that such individual was not suspended or discharged for cause." H.R. 3020, 80th Cong., 1st Sess., § 10 (1947). Quoting passages from debate on this provision, the Board argues that

Congress intended to keep the burden of showing cause where Congress understood that it had been—on the employer. 93 Cong..Rec. 6518–19 (remarks of Senator Taft); 93 Cong. Rec. 7529 (remarks of Senator Ball). Wright Line argues, citing other passages of debate and quoting the Conference Report on the bill, that Congress did indeed intend to keep the burden where it was—on the Board. H.R.Conf. Rep. No. 510, 80th Cong., 1st Sess. 55 (1947); 93 Cong.Rec. 6518–19 (colloquy between Senators Taft and Pepper). We find the legislative history as well as the statutory language inconclusive on the question of burden of proof. This provision of section 10(c) served to reaffirm the substantive standard that was already implicit in section 8(a)(3) and that we have repeatedly urged on the Board: reinstatement is not warranted if the discharge was actually the result of "cause" rather than of unlawful discrimination, even though "cause" might coincide with union activity to which the employer is hostile. *See NLRB v. Eastern Massachusetts Street Ry. Co.*, 235 F.2d 700, 709 (1st Cir. 1956) ("The purpose of this provision is to make it abundantly clear that the Board is not to interfere with the exercise by employers of their traditional right to discharge employees for adequate cause."). The question of burden of proof is addressed only in the "preponderance" language of the preceding sentence of section 10(c); that provision requires the general counsel to prove the violation by a preponderance of the evidence.

Professor Wigmore distinguishes between the burden of rebutting a prima facie case and the burden of persuading the trier of fact on the ultimate issue in a case by a preponderance of the evidence as follows:

> "[A] 'prima facie' case . . . need not be overcome by a preponderance of the evidence, or by evidence of greater weight; but the evidence needs only to be balanced, put in equipoise, by some evidence worthy of credence; and, if this be done, the burden of the evidence is met and the duty of producing further evidence shifts back to the party having the burden of proof . . . ."

9 Wigmore on Evidence § 2487, at 282 (3d ed. 1940), *quoting Speas v. Merchants' Bank & Trust Co.*, 188 N.C. 524, 125 S.E. 398 (1924).

Put another way, the general counsel's initial, prima facie showing creates a kind of presumption that an unfair labor practice has been committed. At this point, the employer risks losing his case unless he rebuts the presumption with evidence of his own. The Board may properly recognize this by stating that the employer (who alone has access both to the reason he discharged the employee and any corroborative evidence) now comes under a "burden" to produce evidence of a "good" reason for the discharge. The imposition of this limited burden, however, does not shift to the employer the burden of proving that an unfair labor practice has not occurred. Rule 301 of the Federal Rules of Evidence

very aptly describes the scope of the duty involved in rebutting presumptions in civil cases as "the burden of going forward with evidence to rebut or meet the presumption," and distinguishes this duty from "the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." Fed.R.Evid. 301. Thus, the employer in a section 8(a)(3) discharge case has no more than the limited duty of producing evidence to balance, not to outweigh, the evidence produced by the general counsel.

The Board may properly provide, therefore, that "Once [a prima facie showing] is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." 251 NLRB No. 150, at 20–21 (footnote omitted). The "burden" referred to, however, is a burden of going forward to meet a prima facie case, not a burden of persuasion on the ultimate issue of the existence of a violation.[9]

We recognize that the Supreme Court's language in *Mt. Healthy* appeared to place an affirmative burden of persuasion on the employer. We further recognize that this court's acceptance of *Mt. Healthy* in some previous cases may have suggested that we, too, saw the burden upon the employer as, in all situations, a burden of persuasion.[10] A closer look at *Mt. Healthy*, however, indi-

---

**9.** The Board appears to recognize that the general counsel must always establish the existence of an unfair labor practice by a preponderance of the evidence, but then confuses the issue by mislabeling the employer's burden as an "affirmative defense." 251 NLRB No. 150, at 18 n.11. The employer's duty, however, is merely a burden of producing rebuttal evidence and thus in no way resembles a true affirmative defense. Moreover, the Board's reference to its own "prima facie case" may suggest that the general counsel should prevail upon a showing of something less than a preponderance of evidence that the counsel's version of disputed facts is the true one. Let there be no mistake here either. The burden of persuasion on all issues of disputed fact rests at all times with the general counsel.

**10.** *Statler Industries*, 644 F.2d 902 (1st Cir. 1981), for example, suggested that an employer in a section 8(a)(3) discharge case bears the burden of persuasion in proving that there would have been no discharge but for an employee's protected activity. *Id.*, at 905 n.4. On this narrow issue regarding the burden of proof, we disaffirm our previous ruling and adopt the analysis set forth in this opinion. Also, to the extent that *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666 (1st Cir. 1979), can be read to impose a burden of proof on the employer, it, too, is hereby overruled. Nevertheless, we do hold that the Board is justified, after a prima facie showing by the general counsel, in requiring the employer to produce evidence showing "that it had a good reason, sufficient in itself, to produce the discharge." *Id.*, at 671.

cates a critical difference between that case and most labor cases. This difference does not affect the substantive utility of the "but for" analysis there employed, but does affect the nature of the employer's burden.

In *Mt. Healthy*, the employer conceded that he had fired the employee for speech activity which was later found to be fully protected under the first amendment. Thus, the "but for" test was not used, as it is in the typical labor case, as a part of the process of deciding whether a violation of protected rights had occurred. Rather, the "but for" test applied only *after* such a violation had been proven by the employer's own admission. The employer's claim, then, was a true affirmative defense to a rehiring order—*i. e.*, the employer contended that notwithstanding his violation of the Constitution reinstatement was improper as a remedy because the employee had also been involved in an altercation with another teacher, an argument with cafeteria employees, and an incident in which he made obscene gestures to female students. The employer argued that these incidents, which were totally independent of the protected speech activity, justified the employee's dismissal *notwithstanding* the fact that the employer had violated the employee's constitutional rights.[11] The employer's claim was thus a true affirmative defense which went to the appropriateness of the remedy

being applied rather than to the existence of a violation in the first instance.

By contrast, in the typical labor case (and in the present case), the employer vigorously disputes the determining reason for the discharge. These cases therefore do not involve true affirmative defenses going to the appropriateness of the remedy, nor would the "but for" analysis be employed to determine the existence of such an affirmative defense. Rather, the "but for" test is in such cases a convenient formula for deciding whether or not an unfair labor practice has actually occurred—*i. e.*, for deciding if the determining motive of the discharge was anti-union animus or some valid business reason. The "but for" standard requires a determination by the Board, based on all the evidence, that, wholly apart from an alleged illegal motive, the employer would (or would not) have discharged the employee for the conduct ascribed to him by the employer. If the discharge would have taken place irrespective of the anti-union motive, no unfair labor practice took place: if the discharge would not have taken place, it is clear that the determining reason for the discharge was the protected activity, not the reason given by the employer.[12] With respect to this ultimate question of a determining causal link between the bad motive and the discharge, the burden of persuasion remains always with the general

11. A similar claim might, on rare occasions, be raised in some labor cases. For example, where an employer fires a person for union activity, in clear violation of section 8(a)(3), but a few days later discovers the employee had, unknown to anyone, been embezzling money, the employer may be justifiably required to prove, by a preponderance of the evidence, that a reinstatement order for his unfair labor practice is inappropriate. The employer there is not defending on the ground that the discharge was properly motivated, but rather on the theory that, notwithstanding the commission of an unfair labor practice, he should not have to take the particular person back. *Cf. NLRB v. Savin Business Machines Corp.*, 649 F.2d 89, 93 (1st Cir. 1981) (employee's participation in robbery after unlawfully motivated discharge would have great bearing on right to reinstatement). It should be emphasized, however, that this is the rare case. Typically, employers and the general counsel point to the same or to related evidence and ascribe different inferenc-

es of motivation. In this more normal situation, the general counsel must prove, by a preponderance of the evidence, that the employer had an illegal motivation *and* that the employer would not have fired the employee anyway for a valid business reason.

12. Our disagreement with the Board may reduce to this: the Board apparently feels that the Act is violated by a showing of anti-union sentiment in connection with a discharge. It would then impose an affirmative defense upon the employer to negate the violation. In our view, by contrast, the Act is violated only when an employer with anti-union animus discharges an employee he would not have fired "but for" the employee's union activity. We think that even employers who do not particularly like unions nevertheless comply with the law so long as they treat all their employees—union and non-union—alike.

counsel. In the course of its inquiry, however, the Board and the ALJ are entitled to place a burden of production on the employer in the manner already described once a sufficient prima facie showing of illegal motive is made by the general counsel. *Cf. Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (stating that burden of persuasion on the issue of discriminatory intent in Title VII cases remains always with the plaintiff).

It may be said by way of concluding our discussion on this point that labels concerning burdens of "persuasion" and "production" are not, as a practical matter, likely to be very important in most of these cases. Decision will usually turn on a weighing of all the evidence. But this weighing, under the Board's new formulation, will include a careful consideration of the employer's "good" reason as well as of the general counsel's evidence of improper motive. This approach will assure that due consideration is given to all facets of the case.

### III.

▮ Applying these principles to Wright Line's discharge of Bernard Lamoureux, we find substantial evidence to support a conclusion by the Board, on the preponderance of the evidence, that Lamoureux was discharged because of his union activity.[13] We therefore affirm the Board's finding that Wright Line violated the Act in discharging Lamoureux, and that Lamoureux is entitled to reinstatement with back pay.

As background to the discharge, the general counsel presented evidence that Lamoureux was a leading union advocate and that Wright Line management was aware of Lamoureux's role. The evidence showed that management was aggressive in its opposition to the union and that management's hostility was on occasion directed at Lamoureux in particular.[14] The general counsel also presented evidence of the circumstances surrounding the discharge itself. These circumstances, taken together and in the light of this background, support the Board's inference that the company was watching Lamoureux for any transgression that might provide an opportunity for discharge, and that it seized on Lamoureux's otherwise trivial offense to effectuate its true purpose of getting rid of an activist.

**13.** Although the Board arrived at its conclusion by the use of a standard with which, in some respects, we disagree, we see no reason to remand this case for new findings. The ALJ in this case conclusively found that the company's alleged legitimate reason for discharging Lamoureux "has no validity at all" and "was false." There is substantial evidence to support these findings. Moreover, the company here, unlike the school boards in *Mt. Healthy* and *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 693 (1979), did not allege a series of wholly distinct events, some of which were unrelated to protected activity and which might "admit of the argument" that the employer would have discharged Lamoureux despite his union activity. *Id.*, at 417 n.5, 99 S.Ct. at 697 n.5. Thus, no remand is necessary in this case.

**14.** There was testimony that the company distributed reproductions of newspaper articles derogatory to the Teamsters Union, including one article relating the murder indictment of an official of another Teamsters local. There was also evidence of a letter to employees in which the company president stated that Wright Line's "chances for survival and growth would be seriously hurt by the presence of a union," and evidence of three incidents during the 1977

campaign involving Lamoureux. On one such occasion, Supervisor Forte called Lamoureux to his office and charged him with "pressuring someone to vote union"; Forte later retracted the statement. On another occasion, Forte saw Lamoureux counting his pay and asked "What's that? Union campaign funds?" In a third incident, a foreman told Lamoureux that "Everybody knows you're the union kingpin." Wright Line contends that the Board's reliance on these incidents is improper, since the Board has not alleged that any of them involved an unfair labor practice by the company, and since some may involve expression protected by the first amendment. We have held, however, that anti-union statements "plainly within [management's] rights . . . do lend a significance to otherwise ambiguous events when the question is whether a given course of conduct was actuated by anti-union animus." *NLRB v. Lowell Sun*, 320 F.2d at 840. The incidents cited, whether lawful or not, do not prove that Lamoureux was discharged because of his union activity. But they do show that the company knew of his activity and was displeased by it; they thus provide a relevant background for analyzing the circumstances of the discharge.

The evidence showed that Southard asked Forte to check on Lamoureux, who was entering the men's room with a newspaper, even though this conduct violated no company rule and even though Lamoureux had no history of laxity to warrant suspicion. Forte's "checking" consisted of measuring and documenting Lamoureux's absence; it did not include looking in the men's room or paging Lamoureux, even though Lamoureux's job was such that he might have been absent for a legitimate purpose. When Forte found Lamoureux after another absence later in the day, he did not ask for an explanation, although he apparently considered the absence significant enough to merit recording. From these facts, the Board could reasonably infer that Southard and Forte were primarily interested in building a case against Lamoureux rather than simply assuring that he attend properly to his work.

The events following Forte's review of Lamoureux's time report also support the inference of impropriety. Rather than confronting Lamoureux directly, as might be expected of a supervisor who discovers an apparent transgression by an otherwise satisfactory long term employee, Forte immediately consulted higher officials. These managers' first response was that the offense was "dischargeable"; they made the decision to discharge Lamoureux even before discussing the matter with him. By the time Lamoureux was called in, Forte had prepared his final paycheck and drafted a memorandum for the file. When Lamoureux finally received a chance to explain, his defense apparently fell on deaf ears. He conveyed no inability or unwillingness to make accurate time reports; rather his response suggested that he had not done so because he had not considered it important, and that he would do so if desired. Nevertheless, he was not warned or reprimanded,

but discharged. From this and other evidence, mentioned hereinafter, the Board could reasonably infer that the inaccurate time report was seized upon to justify action taken for another reason.

This inference might have been overcome had there been evidence establishing that Wright Line would have fired employees in Lamoureux's position (whether or not union activists) for this sort of infraction. For example, it might have been proven that Wright Line was a consistently strict employer who commonly fired employees for rule violations no more serious than this, or else that this was in fact a violation very detrimental to its business which warranted discharge. Had this been done—had it been established that apart from union activity, Lamoureux would have been discharged for making such a time report—a finding for the employer would have been indicated. But no such conclusion was required on this record. Wright Line relies on its rule against "knowingly altering or falsifying production time reports."[15] It emphasizes its use of Daily Activity Reports to verify performance of inspections, to evaluate individual inspectors, and to monitor staffing levels. But the Board concluded, with ample support in the record, that the time of each inspection, as opposed to the fact that each was done and the number done in a day, had no bearing on any of these calculations and received no notice from management. Lamoureux testified, and the Board was entitled to believe, that he had never been instructed to record times exactly, that he had never heard of any employee being criticized for inaccurate reporting of times, and that the general practice among inspectors was to record times in "round figures." The Board could conclude from the evidence that Lamoureux's offense affected no significant inter-

---

**15.** The rule, which also prohibits falsifying "payroll records, or punching another employee's timecard without supervisory approval," provides that a first infraction "may" be punished by discharge or by any lesser disciplinary infraction, such as suspension or a warning. Of course, where an employer enforces a valid

rule in an even-handed manner, there is usually no violation of the Act. *See Texas Instruments v. NLRB*, 637 F.2d 822 (1st Cir. 1981) (finding that employee violation of valid rule prohibiting disclosure of confidential information justified discharge because such activity is not protected by section 7).

est of his employer, and no interest that Wright Line had treated as significant.[16]

Wright Line asserts that Lamoureux's "falsehood" proved him untrustworthy, and therefore unworthy of the reliance it must place on its inspectors. Clearly a showing of dishonesty would cause most employers to discharge an employee. The Board could reasonably doubt, however, that an employer would lose its trust in such a long term, satisfactory employee on the basis of an inaccuracy that cost the employer nothing and gained the employee nothing. Lamoureux's time report, under these circumstances, suggests no intention to falsify; at worst it demonstrates carelessness on a matter of little significance.

Further, the evidence showed that Wright Line's past practice in handling similar offenses had been quite different. The Administrative Law Judge found, based on testimony regarding the time required to perform inspections, that reports submitted by other inspectors contained "easily discernible" inaccuracies; yet no other inspector was ever disciplined in any way for inaccurate time reports. There was also evidence of an incident in which Wright Line's Chief Inspector had another employee punch her time card, a violation of the same rule. *See* note 15, *supra*. Even though such conduct strongly suggests deliberate falsification to cover an unexcused absence at the employer's expense, the Chief Inspector received only a warning; she was not discharged. There was evidence that Wright Line had discharged two employees for dishonesty, but both instances involved conduct amounting to outright theft from the company. One of these employees, an accountant, had embezzled funds, while the other, a salesman, had falsified his reports so as to collect unearned commissions. On this evidence, the Board

was warranted in perceiving a difference between Wright Line's responses to Lamoureux's offense and its handling of comparable incidents of misconduct. The Board could reasonably infer from this that some other factor was involved in Lamoureux's case; and the background of Lamoureux's activism and the company's animus could be thought to supply the missing factor.

Further support for the Board's conclusion as to Wright Line's motivation comes from the ALJ's credibility judgments. To rebut the inference of improper motive, Wright Line presented the testimony of three of the officials involved in the discharge. Each related his own view of the incident, denying any concern for Lamoureux's "untrustworthiness," as shown by his false time report. The ALJ stated that, from the demeanor of the witnesses as well as from "the record as a whole ... I do not believe that they were truthful in revealing the 'real reason' for Lamoureux's discharge." The ALJ's evaluation of Forte's testimony is particularly specific. He found that Forte appeared generally honest, until questioned about Lamoureux's discharge. "Here, being a generally truthful man, he showed physical signs of disassembling." The ALJ's credibility judgments must stand unless they are unreasonable, which these are not. Under these circumstances, the witnesses' untruthfulness strengthens the inference of unlawful motive. *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966).

On this record, the Board was justified in finding that the general counsel had proven, by a preponderance of the evidence, that Wright Line discharged Lamoureux because of his union activity in violation of section 8(a)(3) of the Act.

*The petition for enforcement is granted.*

---

**16.** It is, of course, the employer's judgment of the importance of time records, and not the Board's judgment or our own, that matters. An employer is entitled to make and enforce his own rules, however foolish they may appear to the Board, as long as he does not base personnel decisions on union status. *See, e. g., Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d at 603. Nevertheless, where the issue is what motivated a decision to discharge, the apparent insignificance of a particular rule, along with the employer's history of treating it as unimportant, support an inference that something more was involved than just a breach of that rule.