**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FERMONT, A DIVISION OF DYNAMICS CORPORATION OF AMERICA, Respondent.**

No. 1075, Docket 90–4130.

United States Court of Appeals, Second Circuit.

Argued Feb. 28, 1991.

Decided March 21, 1991.

610

Marilyn O'Rourke, Washington, D.C. (Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Howard E. Perlstein, Supervisory Atty., Peter D. Winkler, Robert N. Herman, Office of Gen. Counsel, John Truesdale, Office of Executive Secretary, Washington, D.C., Peter B. Hoffman, Office of the Director, Hartford, Conn., of counsel), for petitioner.

Robert B. Mitchell, Bridgeport, Conn. (Loraine M. Cortese-Costa, Susan M. Sedensky, Durant, Sabanosh, Nichols & Houston, of counsel), for respondent.

Before OAKES, Chief Judge, LUMBARD and CARDAMONE, Circuit Judges.

PER CURIAM:

In this case, the National Labor Relations Board (the "NLRB") seeks to enforce its two decisions and orders, dated November 19, 1987, and October 10, 1989, respectively, which require respondent (Fermont, a Division of Dynamics Corporation of America) to offer reinstatement with back pay to three of its employees—Christine Dumas, Miguel Lugo and Mark McGraw—who were allegedly unlawfully issued disciplinary warnings for absenteeism due to their union activities. For the following reasons, enforcement is granted.

## BACKGROUND

Beginning in December 1981, a number of respondent's employees became dissatisfied with their collective-bargaining representative's unwillingness to prosecute employee grievances against the company. As a result, they contacted a rival union, which, in March 1982, filed a petition for certification with the NLRB. An election to determine the employees' future collective-bargaining representative was held on May 14, 1982. After the new union narrowly won the May election, respondent challenged the results, forcing a re-run that was held on November 12, 1982, in which the employees voted against any union representation. However, the results of the second election were set aside because of the initiation of this suit, which challenges respondent's conduct before and after the May 14 election.

The Administrative Law Judge (the "ALJ") who tried the case in September 1983 found that respondent had engaged in a widespread illegal campaign to encourage its employees to vote against any union representation in the May election. Specifically, the ALJ found that respondent had offered employees an automatic raise as an inducement to vote for the company, had threatened to discharge at least one employee who had engaged in pro-union activity, and had awarded prizes in a contest where employees were asked to point out why everyone should vote against any union representation in the election.

In addition, the ALJ found that respondent manipulated its attendance policy both before and after the May election in an attempt to induce employees to vote against the union.[1] Initially, the ALJ found that one of respondent's supervisors had held a meeting on May 7 in which he promised three employees that if they voted against the union, previous disciplinary notices that had been issued for absenteeism would be dismissed. In addition, the ALJ found that respondent had failed to enforce uniformly the attendance policy before the May election, but, once the election was over, had strictly enforced the policy against those employees who had engaged in pro-union activity. In so finding, the ALJ focused on the fact that respondent had issued no disciplinary warnings to employees for the two months preceding the election, but that immediately after the election, had issued an "avalanche" of warnings to union supporters who had been excessively absent in the months preceding the election.

As a result of these findings, the ALJ concluded that respondent violated 29 U.S.C. § 158(a)(1) ("section 8(a)(1)"), which makes it unlawful for an employer to "interfere with, restrain, or coerce employees" from engaging in certain concerted activities. However, the ALJ concluded that none of these unfair labor practices had violated 29 U.S.C. § 158(a)(3) ("section 8(a)(3)"), which makes it unlawful for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." According to the ALJ, this conclusion was warranted because, in his view, the motivation to suspend or discharge employees during the election year had not been based on anti-union animus.

In reviewing the ALJ's 1983 decision, the NLRB agreed that respondent's attempts to persuade its employees to vote against the union in the May election had violated section 8(a)(1). However, the NLRB disagreed with the ALJ regarding section

---

1. As respondent's employee handbook states, the company's method of handling excessive absenteeism and tardiness is as follows: the personnel department monitors employees' attendance records, and informs supervisors on a regular basis of those employees whose absenteeism or tardiness has been excessive, which is defined as "more than 2 total absence occurrences or more than 3 tardiness or partial work days ... or any combination ... equalling more than 3 in any one calendar month." The super-

visor is then expected to take appropriate action according to the normal disciplinary procedure, which states that penalties for excessive absenteeism shall be:

1st Offense—Verbal Warning
2nd Offense—1st Written Warning
3rd Offense—Final Written Warning
4th Offense—Suspension from work without pay (3 days)
5th Offense—Discharge.

8(a)(3), finding that any suspensions or discharges made as a result of respondent's strict, post-election enforcement of its attendance policy were discriminatory. As a result, the NLRB remanded the case to the ALJ for a determination whether any post-election disciplinary warnings that had been issued for pre-election absences had been, in whole or part, the basis for the ultimate decision to suspend or discharge five of the employees. On remand, the ALJ found that those five employees had not been discharged because of the post-election warnings, but instead because of actual excessive absenteeism. In its supplemental decision, the NLRB once again disagreed with the ALJ, and found that the decision to fire Dumas, Lugo and McGraw had been predicated on the illegal, post-election warnings, and ordered that respondent offer the three reinstatement with back pay.

In resisting this petition for enforcement of the NLRB's decisions and orders, respondent argues (1) that the evidence does not support the ALJ's initial finding that respondent violated section 8(a)(1) by issuing post-election warnings for pre-election absences; (2) that the NLRB erred as a matter of law in not making individual findings that each post-election warning was improper; and (3) that the evidence does not support the NLRB's final determination that Dumas, Lugo and McGraw were discharged because of the post-election warnings, in violation of section 8(a)(3).

## DISCUSSION

### I. *Section 8(a)(1) Violations*

■ The broad remedial purpose of section 8(a)(1) is to safeguard employees' right to engage in union activities without employer interference. *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459–60, 11 L.Ed.2d 435 (1964). As such, it is unlawful for an employer to make threats or promises to employees that are targeted to "impinge[ ] upon their freedom of choice for or against unionization and [are] reasonably calculated to have that effect." *Id.* Findings of fact by the NLRB demonstrating such unfair labor practices must be upheld if supported by substantial evidence. *See* 29 U.S.C. 160(e) (1988); *NLRB v. Oakes Machine Co.*, 897 F.2d 84, 89 (2d Cir.1990); *see also Grandee Beer Distributors, Inc. v. NLRB*, 630 F.2d 928, 932 (2d Cir.1980) (substantial evidence standard applies to NLRB's adoption of an ALJ's findings of fact).

Here, the only question is whether there was substantial evidence to support the ALJ's initial finding that, after the May election, respondent intensified enforcement of its attendance policy against employees because of their union activities. In coming to his conclusion, the ALJ focused on three factors: (1) that respondent's personnel director, Joseph Adante, had failed to provide a reasonable explanation why there was an "avalanche" of disciplinary warnings issued to union activists after the May election; (2) that Adante failed to explain adequately why Robert Smith, an acknowledged union activist, received disciplinary warnings after the election for pre-election absences, when other employees with similar attendance records, but who had not been union supporters, did not receive such warnings; (3) that Adante was not credible as a witness because, during his testimony, he initially claimed that the delay in issuing disciplinary warnings for pre-election absences had been caused by his heavy involvement in the May election, but later abandoned that explanation and argued that the company often fell behind in issuing warnings for absences.

Viewing this evidence in the context of the record as a whole, we find that the ALJ's decision was supported by substantial evidence. Respondent concedes that there was, in fact, a substantial delay in issuing warnings to union supporters for absences that occurred in the two months prior to the May election. In addition, respondent does not challenge the fact that on May 7, one of its supervisors had attempted to influence employees to vote against union representation by offering to rescind disciplinary warnings that had accrued. While these facts are not dispositive, they lend credence to the ALJ's conclusion that respondent willingly used its

attendance policy to influence employees' votes. This evidence, coupled with the other factors explored by the ALJ, supports the ALJ's conclusion that "there was instituted against union activists because of their union activities a policy of strict enforcement of an attendance and punctuality policy that prior to the union campaign had not been uniformly enforced."

## II.  Section 8(a)(3) Violations

[2] In coming to its conclusion that respondent's issuance of post-election disciplinary warnings for pre-election absences was a violation of section 8(a)(3), the NLRB did not make individual findings that respondent had, in fact, discriminated against any particular employee. Rather, the NLRB summarily concluded that *all* warnings issued under the post-election, stricter enforcement policy were *per se* violations of section 8(a)(3). Respondent now challenges this conclusion, arguing that *Wright Line*, 251 NLRB 1083 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), requires that it be provided an opportunity to demonstrate that, even in the absence of any union activity, it would have issued post-election warnings to Dumas, Lugo and McGraw.[2] According to respondent, because the NLRB summarily disposed of the section 8(a)(3) issue, it was denied this opportunity.

This claim is unpersuasive. As previously mentioned, the ALJ, after noting that those absentees who did not support the union did not receive post-election warnings, found that respondent had delayed in issuing warnings to union activists because of its anti-union animus, and not because of any innocent motivation. The ALJ also found that Dumas, Lugo and McGraw had engaged in union activity, and that each had received post-election warnings for pre-election absences. These findings, taken together, establish that the ALJ implicitly

concluded that Dumas, Lugo and McGraw were members of the class of employees who would not have received post-election warnings but for their union activity. After reviewing these findings, we conclude that respondent did receive full consideration on all of its claims in this case. Under these circumstances, we need not remand so the NLRB can simply confirm this fact.

## III.  Discharge of Dumas, Lugo and McGraw

■ Finally, the NLRB's supplemental decision that Dumas, Lugo and McGraw were discharged in violation of section 8(a)(3) is supported by substantial evidence. In disagreeing with the ALJ's conclusion that the warnings were not the cause of respondent's decision to discharge the employees, the NLRB employed the *Wright Line* two-step analysis. First, to assess whether the General Counsel met its *prima facie* burden of showing that the illegal warnings were a "motivating factor" in the discharges, the NLRB cited the five-step disciplinary system articulated in respondent's formal attendance policy, and noted that each employee had received verbal warnings, written warnings and suspensions prior to discharge, in conformity with that policy. In addition, the NLRB reviewed the employees' "Personnel & Payroll Information" sheets, which indicated that the discharges were "per company policy," and respondent's "Monthly Attendance Analysis," which indicated that each progressive step in discipline was based on the employees' previous disciplinary level. Based on this evidence, the NLRB found that respondent had discharged Dumas, Lugo and McGraw because they had received the maximum number of disciplinary warnings and suspensions allowable under the company's formal attendance policy, and not, as the ALJ found, because their attendance records simply suggested "excessive absenteeism." Because these disci-

---

**2.** In *Wright Line*, the NLRB first articulated its two-part test for section 8(a)(3) violations. First, the General Counsel must make "a *prima facie* showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." 251 NLRB at 1089.

Thereafter, the burden shifts to the employer "to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Id.* One corollary to this rule, of course, is that an employer must be given an adequate opportunity to make such a showing.

plinary warnings included those that had been illegally issued after the May election, the NLRB concluded that the General Counsel met his burden in this case.

Next, the NLRB concluded that respondent had failed to demonstrate that it would have discharged the three employees without reliance on the illegal warnings. Here, the NLRB noted a fundamental distinction between the motivation behind discharge decisions and whether those decisions are, in fact, justified. Although the NLRB concluded that respondent may have been warranted in discharging Dumas, Lugo and McGraw due to their excessive absenteeism, it found that respondent was motivated to discharge the employees in part because they had reached the fifth-rung on the disciplinary ladder. In coming to this conclusion, the NLRB cited testimony by Adante, who had explained that, in general, employees were disciplined based on their "proper stage" in the disciplinary system.

Certainly, the ALJ and the NLRB both provided substantial justification for their varying conclusions, and were the issue before us *de novo*, we may well be persuaded that the ALJ was correct. However, that is not our function. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951) ("[A] court may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."). Rather, our task is to determine whether there is substantial evidence to support the NLRB's findings, *see Grandee Beer Distributors*, 630 F.2d at 932, which we believe is readily apparent.

Accordingly, the NLRB's application for enforcement of its two decisions and orders is granted.