953 F.2d 641
 139 L.R.R.M. (BNA) 2400
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
WELDON MILL, A DIVISION OF BELDING HAUSMAN FABRICS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
WELDON MILL, A DIVISION OF BELDING HAUSMAN FABRICS, INC., Respondent.
 Nos. 90-2168, 91-2103.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 29, 1991.
Decided Jan. 17, 1992.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board, No. 5-CA-19907.
 ARGUED: Samuel M. Brock, III, Mays & Valentine, Richmond, Va., for petitioner; Magdalena Sofia Revuelta, National Labor Relations Board, Washington, D.C., for respondent.
 On Brief: D. Eugene Webb, Jr., Mays & Valentine, Richmond, Va., for Petitioner; Jerry M. Hunter, General Counsel, D. Randall Frye, Acting Deputy Attorney General, Aileen A. Armstrong, Deputy Associate General Counsel, Collis Suzanne Stocking, Supervisory Attorney, Howard E. Perlstein, National Labor Relations Board, Washington, D.C., for respondent.
 
 NLRB
 
 1
 ENFORCEMENT GRANTED.
 
 
 2
 Before K.K. HALL and MURNAGHAN, Circuit Judges, and ALEXANDER HARVEY, II, Senior United States District Judge for the District of Maryland, sitting by designation.
 
 OPINION
 PER CURIAM:
 
 3
 The National Labor Relations Board (NLRB) petitions for enforcement of its order finding that respondent Weldon Mill violated §§ 8(a)(1) and (3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. Weldon Mill petitions for review of the same order. We grant enforcement.
 
 I.
 
 4
 Weldon Mill operates a textile mill in Emporia, Virginia, where it employs 200 workers in three shifts. Its work force consists largely of two types of employees: "weavers," who operate looms, and "technicians," who repair the looms when necessary. As one might expect, there are many fewer technicians than weavers. The technicians also must be more skilled, and Weldon invests two years of on- and off-the-job training before a technician can perform to Weldon's full satisfaction.
 
 
 5
 Clifton Morriss was one of Weldon's technicians. He was assigned to fifty looms on the midnight shift. His chain of supervision proceeded from floor foreman Edward Driver, to shift overseer Clayton Walker, and finally to weaving manager Charles Currie. Morriss was a friend of Currie. The company considered Morriss a good technician with "potential" for management.
 
 
 6
 In the summer of 1988, however, Weldon's satisfaction with Morriss abruptly ended. The textile workers' union began an organizing campaign at the mill. In late June, an organizer visited Morriss at his home. Morriss agreed to help in the organizing drive. He distributed union literature, solicited signatures on authorization cards, and attended a meeting of union supporters whom the union believed had leadership ability. At this meeting, he agreed to accompany the outside organizers on visits to employees' homes. He was not secretive about his support of the union, and Weldon does not dispute that it was fully aware of his activities.
 
 
 7
 The union soon obtained enough authorization cards to request an election, and a petition for an election was filed on June 29, 1988. Weldon posted a notice on July 1:
 
 TO ALL EMPLOYEES
 
 8
 Much to our surprise--and frankly, disappointment--we just this morning received a petition from the National Labor Relations Board requesting an election here to determine whether or not our production and maintenance employees want to be in a union and want to be represented by a union in their dealings with the Company.
 
 
 9
 We don't believe our employees need or want any outsider to represent them in their dealings with us. Think of what we have accomplished in the past and about what we all hope to accomplish in the future....
 
 
 10
 The plant shut down for a previously-scheduled vacation between July 2 and 9. On July 12, during a conversation between Morriss and overseer Walker in the latter's office, Walker told Morriss he "should be ashamed because [Morriss] was sticking a knife in Charlie Currie's back." Morriss asked Walker what he meant, to which Walker replied, "I heard you're 100% Union." Morriss stated that he had a right to support the union, but Walker said he needed Morriss to "help nail down votes" against it. After a general discussion of working conditions at the mill, Walker mentioned Morriss' brother, a recently hired employee. He observed that he could not promote Morriss' brother if there were a union because he would have to promote someone with more seniority.
 
 
 11
 Later, Walker approached Morriss and told him, "This is not Georgia Pacific.... We cannot operate here with a Union." Morriss understood Walker's statement as an allusion to influence on Morriss from his father, who had been a shop steward at Georgia Pacific for eight years.
 
 
 12
 Just three days later, working the midnight shift, Morriss took his work break in the mill's parking lot. Foreman Driver was looking for Morriss, and he found him outside. Driver asked what Morriss was doing there, and Morriss said he was getting some fresh air. Walker arrived and repeated Driver's inquiry; Morriss stated that he was on his break. Walker said there was a job to run and instructed Morriss to satisfy Driver.
 
 
 13
 At this point, an angry Morriss said that he would take his tools and quit. He punched out of the mill at 5:30 a.m.
 
 
 14
 Later that morning, Driver, Walker, Currie, and plant superintendent William Williams met and decided not to rehire Morriss if he asked for his job back. On July 18, Morriss asked Williams for his job back, but Williams declined. He stated that he would not overrule the decision of Morriss' supervisors that he should not be rehired.
 
 
 15
 It was not unusual for Weldon to have an employee quit, for whatever reason. The usual company policy was to rehire the employee if he had been a good worker in the eyes of his supervisors.
 
 
 16
 Because of the skills it lost by refusing to rehire Morriss, Weldon's head technician had to step in to replace him. Weldon began training several technicians, and incurring the expense of that training, in the hope that one of them, after two years, would be able to permanently replace Morriss. In short, the circumstances show that, absent some potent countervailing reason, the logical thing for Weldon to have done was to rehire Morriss. As Superintendent Williams later testified, "you don't want to lose [a technician] unless you just have to."
 
 
 17
 General Counsel for the NLRB filed unfair labor practice charges. After hearings, an administrative law judge (ALJ) found that the "back-stabbing" comment by Walker to Morris violated NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), by interfering with Morriss' free exercise of his rights secured under NLRA § 7, 29 U.S.C. § 157; the ALJ also found that Weldon violated §§ 8(a)(1) and 8(a)(3), 29 U.S.C. § 158(a)(3), by refusing to rehire Morriss because of his union organizing activity.
 
 
 18
 The NLRB affirmed the ALJ's findings, and adopted the proposed relief with a minor amendment not at issue here. The NLRB ordered Weldon to (i) cease and desist from coercive behavior violative of employees' § 7 rights, and (ii) reinstate Morriss with back pay. Weldon petitions for review, and the NLRB cross-petitions for enforcement.
 
 II.
 
 19
 Resolution of each issue requires only a review of the NLRB's factual findings. These findings are conclusive if supported by "substantial evidence on the record considered as a whole." NLRA § 10(e), 29 U.S.C. § 160(e). We believe that substantial evidence supports all of the findings.
 
 A.
 
 20
 Weldon argues that Walker's comment that Morriss should be "ashamed" of "sticking a knife in Charlie Currie's back" was not coercive and did not interfere with Morriss' § 7 rights. The ALJ identified this particular comment as a § 8(a)(1) violation; it may have been possible to have simply held that all of Walker's comments to Morriss constituted a single violation. Instead, the ALJ used the other statements as more of a background or context in which to decide whether the "backstabbing" comment violated § 8(a)(1).
 
 
 21
 In any event, we agree that substantial evidence supports the finding that a violation occurred. Telling someone he ought to be ashamed for supporting a union, and characterizing that support as betrayal of a friendship, goes well beyond the permissible bounds of organizational-campaign debate. Walker did not try to persuade Morriss with noncoercive reasoning--he attacked Morriss' character.
 
 B.
 
 22
 The ALJ found that Morriss quit; he was not fired. Nonetheless, the NLRA prohibits discrimination "in regard to hire" as well as "tenure" because of an employee's exercise of § 7 rights. Therefore, if Weldon refused to rehire Morriss because of his union activity, it violated § 8(a)(3). Section 8(a)(1) is also transgressed in those circumstances because hirings and firings on account of union activity chill employees' free exercise of § 7 rights.
 
 
 23
 Undisputed background facts give Weldon a difficult task of explanation. Morriss' quitting put the company a very valuable man short. It required the head technician to return to the floor and the investment in two years of training for several prospective replacements. According to its own superintendent, Williams, Weldon never wanted to face that situation unless it "just had to." Within three days of the beginning of this bind, before Weldon had invested in replacement training, a completely qualified person, Morriss, presented himself and requested the job. Nonetheless, Weldon turned him down.
 
 
 24
 Why? The ALJ concluded--from the timing, Weldon's knowledge of Morriss' union activity, and the anti-union attitude evidenced by the posted "Notice to Employees" and by Walker's comments to Morriss--that Morriss' support of the union was the reason.*
 
 
 25
 The company protests, but the force of its protest is blunted by its failure to offer a credible alternative explanation. It offers vague references to "past difficulties" and "significant problems" with Morriss. These "difficulties" had resulted in only one blemish on Morriss' work record, a 1987 warning for overstaying his break by five minutes. The ALJ's findings and reasoning on this point are persuasive:
 
 
 26
 Plant manager Williams was the sole witness examined as to the refusal to rehire, and he testified that he deferred to the judgment of Driver and Walker. Both downgraded Morriss, but not on the basis of his skills. Instead, they were examined as to his general work history, stressing his propensity to leave his work area without authorization, an offense which undoubtedly required control and correction, but for which Morriss had never been formally warned. Moreover, while their dissatisfaction was less than coextensive, neither was examined as to whether and why they allegedly decided against rehire, or if in fact any such decision was communicated to Williams. Thus, the Respondent, having elected to stand solely upon Williams['] testimony, has denied the opportunity to consider the precise grounds on which reemployment was denied and the credulity of those reasons. In this light, considering the operational disadvantages and uncertainties to be faced by elimination of a fully trained, competent technician, this doubt-ridden and incomplete presentation fails to overcome the prima facie showing of proscribed discrimination. Simply put, the Respondent has failed to offer any persuasive proof that, in the absence of union activity, it still would have made no attempt to salvage the Employer's investment in Morriss. Accordingly, ... the Respondent violated Section 8(a)(3) and (1) of the Act by failing to rehire him.
 
 
 27
 In summary, Weldon had to have had some reason not to rehire Morriss; in light of the difficulties Morriss' absence posed to the company, it must have been a strong reason. Weldon's vague explanation falls short.
 
 
 28
 We grant enforcement of the NLRB's order.
 
 
 29
 ENFORCEMENT GRANTED.
 
 
 
 *
 The employee need only show that his union activity is a, rather than the, reason for the adverse action in order to establish a prima facie case. The burden then shifts to the employer to prove by a preponderance of the evidence that it would have taken the adverse action against the employee for wholly lawful reasons and even in the absence of the employee's protected activity. NLRB v. Transportation Management Corp., 462 U.S. 393 (1983); Wright Line, 251 NLRB 1083 (1980), enforced on other grounds, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989 (1982)