875 F.2d 316
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SOUTHERN MARYLAND HOSPITAL CENTER, Respondent.
 No. 88-2614.
 United States Court of Appeals, Fourth Circuit.
 Argued: April 12, 1989.
Decided: May 18, 1989.
 
 Warren Malcolm Davison (Benjamin W. Hahn, Littler, Mendelson, Fastiff & Tichy, on brief), for respondent.
 John Duncan Burgoyne, Assistant General Counsel (Rosemary M. Collyer, General Counsel; Robert E. Allen, Associate General Counsel; Aileen A. Armstrong, Deputy Associate General Counsel; Nancy B. Hunt, National Labor Relations Board, on brief), for petitioner.
 Before SPROUSE and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 The National Labor Relations Board ("the Board"), after a hearing by an administrative law judge ("ALJ"), found that Southern Maryland Hospital violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, as amended, 29 U.S.C. Secs. 158(a)(1), (a)(3), by discharging Carol A. Kline and by disciplining and then failing to reinstate Donald Keller after he rescinded his resignation. It ordered their reinstatement and back pay and now seeks enforcement of its order. We grant enforcement of the Board's order as it concerned Kline but deny it as it related to Keller.
 
 
 2
 Carol Kline, a nurse, was an active union organizer during two elections conducted at the hospital and testified at an unfair labor practices hearing held after the first election. Noreen Briley, a former employee of the hospital, testified that Dr. Francis Chiaramonte, the President of the hospital, had called Kline a "dirty rat" and "disloyal" and that, following the union's defeat in the second election, he had instructed department heads to get rid of union organizers. Further, Linda Stem, a nurse at the hospital, testified that she had overheard a conversation in which Marie Palmquist, the hospital's former Director of Nursing, asked Jacqueline Anderson, the Cardiac Care Unit Head Nurse and Kline's immediate supervisor, what was being done to remove Kline. Stem testified that Anderson later told her that Anderson was being pressured to remove Kline because of Kline's union activities.
 
 
 3
 Kline was fired on April 9, 1985, four months after the second election. The first of four incidents that the hospital cites to justify its action occurred one week after the election when Kline called in sick for the midnight shift on December 12, 1984, although she had been at a bridal shower at the hospital that afternoon. Although hospital regulations only require an excuse for an absence of three days or more, Anderson exercised her discretion to require one for Kline's absence. Kline, who had returned to work the next day, was only able to get a "return to work statement," which Anderson rejected because it was not a doctor's excuse. Anderson prepared an Employee Corrective Action Report ("ECAR") concerning this incident, but Kline denies that she was ever shown it or given an opportunity to comment on it.
 
 
 4
 The second incident occurred on January 9, 1985, when Kline left the hospital at 1:30 p.m. with the only key to the CCU's narcotics cabinet in her pocket. She states that when she discovered the key at 11:00 p.m. that night she called the hospital and the CCU nurse on duty told her that she did not need to return it that night. Anderson testified, however, that Kline told the nurse on duty that she would not get dressed to bring the key in that night. Anderson again wrote up an ECAR but did not issue it to Kline or include it in her personnel file.
 
 
 5
 The third incident occurred on March 13, 1985. On that day Kline had several confrontations with the relatives of one of her patients. In addition, she left for lunch without feeding that patient in order to reach the hospital cafeteria before it closed. Kline testified that she had asked another nurse to feed the patient, but the patient still had not been fed by 2:00 p.m. After these events, the patient's daughter complained to Palmquist and then sent in a written complaint. After Anderson and Palmquist investigated, Anderson issued an ECAR charging Kline with failure to meet the required standard for nursing care and making inappropriately abrupt responses to family members and suspended her for three days. The ECAR stated that any further incidents might result in termination.
 
 
 6
 Kline returned from her suspension on March 29. The fourth incident occurred the very next day when Kline left the hospital at the end of her shift without making report on one of her three patients. One of the nurses left a message at Kline's home, and Kline called immediately after she got home and gave the report over the phone. Anderson reported this incident to Palmquist, and she and Palmquist jointly decided to terminate Kline, citing this incident in light of her previous record.
 
 
 7
 Donald Keller was an administrative employee (a utilization review coordinator) of the hospital who had been active in the union organizing campaign. Noreen Briley testified that Diane Johnson, Keller's departmental supervisor, told Briley that she had been told to "get rid" of Keller but had found no fault with his performance. Briley also testified that another supervisor had referred to Keller as a "troublemaker."
 
 
 8
 For two years, Keller had worked a four-day/ten-hour shift with weekends and Wednesdays off. Of the three or four utilization review coordinators, only he had this schedule. On May 2, 1985, Johnson and Florence Moran, Keller's immediate supervisor, informed him that he was going to be placed on a five-day/eight-hour schedule because his absence on Wednesdays was causing extra work for his supervisor and the other coordinators and because Johnson could not accommodate another coordinator's request for a four-day schedule. Johnson then gave Keller the choice of beginning the new schedule on the following Monday, May 6, or continuing on the old schedule for one week and beginning the new one when he returned from a previously scheduled vacation. Keller was upset and, according to Moran, stormed out of the meeting after stating, "it appeared that we had already made up our minds, and that it didn't matter to him when he started."
 
 
 9
 Keller worked ten-hour shifts on Monday and Tuesday, May 6 and May 7. Johnson approached Keller on Tuesday and asked him, "What about those eight-hour days?" Keller did not respond directly but handed her a grievance letter challenging the decision to change his schedule. On Wednesday, May 8, when Keller did not show up for work, Johnson concluded that he was being insubordinate by following his old schedule.
 
 
 10
 On Thursday, May 9, Johnson met with Moran, Robert Chappell, the Director of Personnel, and Sebastian Suriani, the Executive Vice-President. Johnson testified that she needed to consult with Chappell concerning the disciplinary procedure and with Suriani concerning the grievance procedure but that she had already made up her mind to discipline Keller. Following that meeting, she wrote up an ECAR citing Keller with insubordination in working ten hours on May 6 and with failing to work on Wednesday and giving Keller two warnings and a one-day suspension. She then met with Keller, told him that she, as department head, had denied his grievance, and gave him the ECAR. Keller asked her to forward the grievance to the next step in the process.
 
 
 11
 Keller served his one-day suspension on Friday, May 10, but called Johnson in the morning asking her to withdraw the grievance. That afternoon he handed in his resignation effective in three weeks saying that he was very unhappy and would hold a grudge every time he had to work on a Wednesday. Both Johnson and Moran asked him to reconsider and offered to hold his resignation, but Keller was adamant about resigning. Johnson then called Suriani to inform him of the resignation because Keller "was a union person and of course that is important to the hospital ... to know these things." Keller testified that no one at the hospital forced him to resign but that he believed his one-day suspension occurred because he was a union organizer.
 
 
 12
 Over the weekend, Keller reconsidered his decision and attempted to rescind it, leaving a message with Johnson's husband on Sunday night and calling Moran on Monday morning. Johnson, however, called Keller at home and told him that his rescission was not accepted and that his resignation would take effect immediately. She testified that she had concluded that his unhappiness and his holding a grudge would disrupt her department, but Keller claims that she told him that she had reached this decision only after discussing it with hospital administrators.
 
 
 13
 The rule announced in the Wright Line cases controls our disposition in this case: where an employer's opposition to protected union activities is shown to be a motivating factor in an adverse action against an employee, the Board may find that action unlawful unless the employer demonstrates that it would have taken the action even in the absence of the protected activity. See NLRB v. Transportation Management Corp., 462 U.S. 393, 402-03 (1983) (approving rule announced in Wright Line, a Div. of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enf'd on other grounds, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989 (1982)). Our view of the Board's decision in this case is limited to determining whether substantial evidence supports its findings that the actions taken by the hospital against Kline and Keller were motivated by anti-union considerations and that the hospital has not shown it would have taken the actions regardless of their union activities. We find that sufficient evidence supports the Board's findings with respect to Kline's discharge but find insufficient evidence in the record to sustain the Board's findings with respect to the hospital's decision to discipline Keller and to refuse to accept the rescission of his resignation.
 
 
 14
 The hospital, of course, documented several instances of unsatisfactory conduct by Kline. The ALJ, however, considered the hospital's evidence as well as Kline's explanation and weighed the severity of the infractions in relation to the hospital's policy. More important, the ALJ found from an abundance of evidence that Kline was a union organizer and that there was a hospital policy to eliminate union adherents under these circumstances. The Board adopted the ALJ's findings, and we conclude that sufficient evidence supports that decision.
 
 
 15
 In our view, insufficient evidence supports the Board's finding in regard to the refusal to accept Keller's rescission of his resignation. All of the evidence indicated that Keller was a favored employee. Although the question of setting office working schedules was unquestionably the prerogative of supervisory employees, Keller unilaterally determined that he would only work a four-day-a-week schedule, adamantly refusing to even discuss the need for the five-day-a-week scheduling of other employees. He was not discharged. He voluntarily terminated his employment despite the entreaties of his supervisor to remain, and the supervisor refused to rehire him after his resignation. The only evidence in the record from which any improper motive could be drawn was that there was a telephone call from Keller's supervisor to her supervisor during the interim when Keller resigned and when he asked to be reinstated. There is no evidence of the substance of the telephone conversation--merely a bald statement that the telephone call was made. Although the record shows that Keller supported the union, it also demonstrates that he was not a militant or a leader in the organization drive. In our view, the hospital demonstrated that it would have disciplined Keller and refused to accept the rescission of his resignation regardless of his union activities, and the Board's finding to the contrary is simply not supported by substantial evidence in the record.
 
 
 16
 In view of the above, we grant enforcement of the Board's order granting Kline relief but deny enforcement of that portion of its order granting Keller relief.
 
 
 17
 ENFORCED IN PART AND DENIED IN PART.