**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CLARK MANOR NURSING HOME CORP., Respondent.**

**Nos. 81–1306, 81–1424.**

United States Court of Appeals, First Circuit.

Argued Dec. 9, 1981.

Decided Feb. 24, 1982.

---

David S. Fishback, Atty., Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for petitioner.

Robert Weihrauch, Worcester, Mass., for respondent.

Before COFFIN, Chief Judge, ALDRICH and BREYER, Circuit Judges.

COFFIN, Chief Judge.

These are applications for enforcement of orders of the National Labor Relations Board, directed to Clark Manor Nursing Home Corporation, a geriatric care center for some 162 elderly patients, employing some 155 employees.

*The Bargaining Order*

■ The Board found that the Home violated §§ 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1), by refusing to bargain with the union, Local 1445, United Food and Commercial Workers International Union, AFL–CIO (Professional and Health Care Division). The critical finding was that one Sansoucy, the Home's Activities Director, was a supervisor as defined in § 2(11) of the Act and thus not entitled to vote in an election which was won by the union, 6 to 5. The issue is a close one, there being no strong evidence of key supervisory powers being unambiguously exercised. The Home's staff in any given functional area was small. The activities branch consisted of two people, Sansoucy and a full time assistant. Sansoucy's testimony made it evident that her modus operandi was to sheathe the hand of authority in the glove of accommodation. The evidence showed, however, that she complained at least twice prior to the discharge of an earlier assistant; that she suggested the hiring of a successor, a person with whom she had worked at another nursing home, and that this person was chosen for the job; that she planned the activities and gave daily marching orders to her assistant; and that her level of training and salary and attendance at staff planning meetings were consistent with supervisor status. These facts amply support the Board's carefully considered findings and insulate them against any reversal on our necessarily limited judicial review. *See Stop & Shop Companies v. NLRB*, 548 F.2d 17, 20 (1st Cir. 1977).

*No Solicitation and No Loitering Rules*

■ The Home's rule from the early 1970's proscribing any solicitation on its premises was changed, on November 21, 1978—some six weeks after union organizing activity began—to conform with the Supreme Court's decision five months earlier, in *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). As amended, it proscribed union solicitation only "in patient care or patient access areas". The Administrative Law Judge and the Board, although acknowledging that the new rule might meet *Beth Israel's* requirements, concluded that the timing of the new rule, the history of its application against only known union supporters, and the Home's encouragement of anti-union activities by employees in disregard of the rule justified holding the November 21 notification a violation of § 8(a)(1).

Perhaps the most salient factor is the last mentioned. The ALJ contrasted the warnings that the Home's principal administrator, Sibulkin, gave to a union activist, Stinchfield, with his encouragement of anti-union lobbying by employee Bolio "with no suggestion, in the latter case, that those activities be confined to non-work areas."

The Home claims that the allegedly suspect conversation is completely "innocuous" and the ALJ-Board finding completely speculative. In so doing, it indulges in the first of many selective quotations from the transcript. The critical testimony on this point was more revealing. Bolio, a physical therapist, testified:

> "He [Sibulkin] said to me, You're anti-union, right? I said, yes.
>
> He said, Okay, I want you to tell people—tell the employees how you feel about it. You know, *you're in every wing, you're on every floor.* You tell them—you know—how you feel." (Emphasis supplied.)

The Board's finding is supportable on this record.

The rule against loitering remained unchanged since its adoption in 1973. It reads as follows:

> "LOITERING Upon completion of your day's work, it is requested that you leave the home premises immediately, so that there will be no delay in the continuance of work schedules. Off duty employees are not to visit other employees while they are working on the premises."

Although this would seem to be directed at excessive conversation between employees of different shifts, the justification proffered by the Home for the rule was that it would protect employees from being accused of theft and vandalism, and that it would help avoid congestion in the parking lot.

■ We cannot fault the Board for concluding that these are not business reasons which justify the preclusion of concerted activity on the Home's parking lot under *Tri-County Medical Center, Inc.*, 222 N.L.R.B. 1089 (1976), which we have recognized in *Eastern Maine Medical Center v. NLRB*, 658 F.2d 1, 5–6 (1st Cir. 1981). Parking lot congestion would not seem to be affected by pedestrian pamphleteers. As for the theft and vandalism rationale, no records or even what little testimony there was on the subject connected employees with the few remote incidents that could be recalled. Finally, the security of the Home from break-ins or inside thievery would hardly seem to be related to people conversing in the parking lot. We therefore affirm the Board's conclusions with respect to the No Loitering Rule.

### Threats and Coercive Interrogations

■ The Board accepted the ALJ's findings of some 13 violations of § 8(a)(1). Of these the Home now challenges only six. We note the obvious, that seven unchallenged threats, arrests and warnings do not disappear by not being mentioned in a brief. They remain, lending their aroma to the context in which the five issues are considered.

The Home argues that the testimony of one St. Jacques referred only to administrator Sibulkin's concern over an upcoming NLRB hearing and could not be considered a threat of retaliation. Although selected portions of the transcript may bear this interpretation, Sibulkin's statement that he was going to "get rid of the troublemakers", which can reasonably be interpreted as referring to union activists, adequately supports the Board.

A supervisor indicated to activist Fowley that administrator Sibulkin knew that Fowley had, in a Union Committee meeting, voiced his exasperation with Sibulkin in vulgar terms. Moreover, on the same or the next day, another management representative mentioned to Fowley that management was apparently obtaining information about what went on at the union meetings. In the context of this case, this may be supportably held a § 8(a)(1) violation, indicating that the boss was keeping a close eye on union activities. So, too, are the interrogations of Yurich, Dumas, and Vachon and the statement made to activists Lyman and Shea ("you'll learn the hard way").

### Adverse Actions in Violation of Sections 8(a)(3) and (1)

■ Of some six incidents found by the Board to be violations of § 8(a)(3) short of discharge, the Home selects only two for

argument on this appeal, once again ignoring the cloud created by the remaining four. One employee-activist, Stinchfield, received two written warnings on successive days for alleged inadequacies in dealing with patients. From our reading of the cold record we cannot tell who was in the right, or, more realistically, who was more in the right—Stinchfield or the Home supervisors. It seems to us a typical judgment call allowed to the ALJ, barring any indicia of arbitrariness. Here we hold that the ALJ justifiably relied in part on the unusual course taken by the Home, failing to talk first with the offending employee or to give her a prior oral warning, and on the absence of testimony from the several other Home employees who were present.

The Home selects for criticism the Board's holding that a warning given a nurse's aide, Baker, for failing to meet with a supervisor and discuss her action in allegedly leaving the Home ten minutes before her shift ended was an unfair labor practice. Inasmuch as four other § 8(a)(3) violations involving Baker are not here in contest, and the Board's ruling here is arguably correct, we see no possible point in troubling to give what in practical effect would be only an advisory opinion on this ruling.

What remains to be considered are three discharges. We discuss them in increasing order of difficulty. We do so, being aware of the fact that our own decision in *NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981), was issued after the Board's decision in these cases. In *Wright Line* we announced our requirement that the employer's burden, once a prima facie case is made, is to come forward with evidence that the discharge was motivated by a non-discriminatory business reason, but that the final burden of persuasion remains with General Counsel. We therefore face the question in cases such as this of whether the Board's decisions on discharge could reasonably differ on reconsideration in light of our recently revised views on burdens.

### The discharge of Girard

▪ In the case of Girard we conclude that the Board supportably found pretext in the defensible meaning of the word. By so saying we mean that the Board's resort to "pretext" was not another way of finding that evidence of improper motive outweighed evidence of proper motive, but that the proffered "good" reasons for discharge were but contrived camouflage.* Girard, another known union activist, received his first written warning several weeks after the causative incident, without management following the usual practice of giving a first oral warning, despite his record as a good worker. His second written warning—or second strike, for three means "out"—was received three weeks after an incident where he had been criticized for talking to friends during work time. The warning added a criticism of his leaving a motorcycle on the premises despite the apparent acquiescence of administrator Sibulkin. Moreover, the recollections of the two management personnel most involved were at odds with each other. The third warning followed allegedly insubordinate behavior toward a superior. But the ALJ discredited the latter and the record reveals no signs that this reaction was unjustified. Indeed the supervisor who issued the warning could recall no essential details of the incident, only three months old, although Girard had been a good worker and this was the first person who was discharged during the supervisor's service with the Home. Under these circumstances we see no possibility of the Board reaching a different conclusion under our newest articulation of burdens of proof.

### The discharge of Shea

▪ The issue of Shea's discharge is troubling because there is so little to be said for the witnesses on either side. The controversy boils down to whether Shea, a college student and part-time dishwasher at the Home, was discharged because he failed to present doctors' statements explaining his absence from work for a full week which he

* The Latin verb, "praetexere", means "to leave    in front".

had agreed to work, or was discharged because he was union activist.

The ALJ discredited Graham, the Home's key witness, and, despite "a poor memory" affecting Shea's testimony, found that Shea had never agreed to work a full week, but had said that he was going to see a doctor on one day; that "there is no indication . . . that the same policy [i.e., requiring a doctor's certification to explain an absence for sickness] applied to a situation where, as here, Shea was a casual employee"; that a one day visit to the doctor, under the prevailing policy, would not trigger a requirement for a doctor's certificate; that, therefore such a requirement was a pretext.

Shea impressed the ALJ as candid, but his testimony—as the ALJ recognized—is riddled with contradictions. These are his versions of what he told his superior about his need for time off: (1) he needed Wednesday off to go to college and discuss schedule, and on another day was going to the hospital to have his back checked; (2) he needed the whole week off to discuss his college schedule and was also going to see a doctor; and (3) the entire week was examination week at school.

Although Shea's version of the incident is admittedly inconsistent, his testimony supports the Board's finding that a doctor's appointment was the reason for his missing at most one day. Graham's testimony— that Shea had said that he had doctor and dentist appointments all week—was specifically discredited by the ALJ, whose decision on witness credibility we defer to here. Thus a doctor's note should not have been required, since the Board supportably found that company policy was to require such a note only when more than one day of work was missed for medical reasons. The Board's conclusion that Shea's discharge was in retaliation for his union activities is consistent with its finding, which we have noted and approved, that Shea was previously threatened that he would "learn the hard way." Finally, we agree with the Board that the Home "advanced no credible justification" for Shea's discharge. Since the Home failed to meet even its burden of production under our *Wright Line* test, a remand is unnecessary.

### The discharge of Fowley

■ The ALJ, although recognizing that the Home had committed several prior unfair labor practices against maintenance employee and union activist Fowley, nevertheless concluded that he was discharged because of his "disruptive and offensive behavior" on May 18, 1979, the day after the union lost the election at the Home, and not because of his union activities. The ALJ specifically found Fowley to have understated his more subdued version of events. The series of events began with Fowley, late in reporting for work, calling the Home. Ehrlich, a psychiatric social worker, asked who was talking. Subsequently, at 10:30 a.m., Fowley came by, pungently criticized Ehrlich for asking him to identify himself on the telephone, then, pointing his finger at Ehrlich, said, "I'll take care of you." Ehrlich reported his concern over Fowley's volatility to Sibulkin.

Fowley, after changing into work clothes, joined several female employees for coffee and doughnuts. In rapid succession he accused employee Lamprey of voting (against the union) as her mother wished, discussed other employees in obscene terms, and, in the ALJ's words, "directed a particularly obscene remark" to Shanley, who immediately, in tears, reported the event to Sibulkin. Not long after, at noontime, he directed another obscenity to employee Pollard, who similarly reported to Sibulkin. He then confronted still another female employee and, banging his elbows on the table, asked her in front of Shanley if a foreman at the Home knew that she had "shacked up" with Fowley. She of course reported this to Sibulkin and was obviously distressed, even, so the ALJ noted, at the hearing. Fowley, having accomplished all this from 10:30 until noon, left for the day. Sibulkin then decided to discharge Fowley.

The ALJ noted General Counsel's arguments that Fowley had had a seven year record of good service, that he was ardently pro-union while those reporting his behavior

to Sibulkin were anti-union, that Sibulkin fired Fowley without telling him his offense or getting his side of the story, that others had behaved worse without being discharged, and that Sibulkin had earlier shown his anti-union animus in retaliatory actions against Fowley. He nevertheless found the evidence "clear and almost undisputed that Fowley came into the nursing home raging, and struck out with obscene, cutting and insulting phrases at those he thought had had a hand in defeating the Union." He distinguished between crude and obscene language, which the Home apparently tolerated, and Fowley's use of "fighting words, directed in anger to wound and to hurt." He noted other cases not resulting in discharge, concluding that the conduct in such cases had not been so intense as Fowley's. He also discussed the other case resulting in discharge and felt it to be comparable. The ALJ therefore concluded that Fowley was fired for legitimate business reasons.

The Board, employing its own *Wright Line* approach, determined that a prima facie case of an unfair labor practice had been made out. It noted, in addition to facts reported by the ALJ, that the Home had discharged only one person other than Fowley who had over two years of service, and that vulgarity had been tolerated and employees had even assaulted each other without being discharged. It faulted the Home for not investigating the complaints and talking with Fowley. We have no trouble agreeing with the Board that a prima facie case of unlawful discharge had been established.

Beyond this point, however, we have problems. The large problem is that the Board, not having our *Wright Line* decision before it, concluded that the Home had "failed to demonstrate" that it would have fired Fowley even if he had not engaged in Union activities. The Board, under our ruling, has the ultimate burden of persuasion, and it cannot seriously be argued (although it was) that the reasons advanced by the Home were pretexts. Moreover, in light of the ALJ's conclusion that Fowley's discharge was for legitimate reasons, and our

own independent review of the entire record, we are persuaded that were the Board to conclude on remand that Fowley was fired because of his union activities, this finding would not be supported by substantial evidence. As the Supreme Court stated in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951), "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Accordingly, we reverse this part of the Board's decision.

*We therefore reverse the Board's finding that Fowley's discharge was an unfair labor practice. In all other respects, the orders shall be enforced.*