**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

LITTLE ROCK ELECTRICAL
CONTRACTORS, INCORPORATED,
                    *Petitioner,*

v.                                              No. 01-2288

NATIONAL LABOR RELATIONS BOARD,
                    *Respondent.*

NATIONAL LABOR RELATIONS BOARD,
                    *Petitioner,*

v.                                              No. 01-2437

LITTLE ROCK ELECTRICAL
CONTRACTORS, INCORPORATED,
                    *Respondent.*

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-17399)

Argued: May 8, 2002

Decided: July 26, 2002

Before MICHAEL, KING, and GREGORY, Circuit Judges.

---

Petition for review denied and cross-application for enforcement
granted by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Judd Hudson Lees, WILLIAMS, KASTNER & GIBBS, P.L.L.C., Seattle, Washington; Charles F. Mills, LITTLE ROCK ELECTRICAL CONTRACTORS, Little Rock, Arkansas, for Little Rock. Eric David Duryea, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

Little Rock Electrical Contractors, Incorporated ("Little Rock") petitions for our review of a September 2001 decision of the National Labor Relations Board (the "Board"). *Little Rock Electrical Contractors, Inc.*, Supplemental Decision and Order, 11-CA-17399 (Sept. 28, 2001) (the "Board Decision"). The Board Decision concluded that Little Rock had violated the National Labor Relations Act (the "Act") by, inter alia, refusing to consider or hire Union applicants because of their actual or perceived Union affiliation. Because the Board Decision is supported by substantial evidence, we deny Little Rock's petition for review and grant the Board's cross-application for enforcement.

I.

In its Decision of September 28, 2001, the Board agreed with its Administrative Law Judge (the "ALJ") that Little Rock had dis-

criminatorily applied its hiring policy to exclude Union members, and it ordered Little Rock to offer the discriminatees substantially equivalent positions, subject to determinations of job availability and back-pay liability.[1] Little Rock disputes certain aspects of the Board Decision, and it contends that it should have been permitted to litigate the qualifications of the discriminatees before the ALJ.[2] In order to properly assess these claims, we must first review the procedural background of this dispute, as well as its factual underpinnings.

A.

On July 23, 1997, the Board issued an unfair labor practices complaint against Little Rock, alleging multiple violations of §§ 8(a)(1) and 8(a)(3) of the Act in connection with the construction of a gambling casino in western North Carolina.[3] After preliminary proceedings, the ALJ, in January 1998, conducted a hearing on the complaint's allegations. In his decision of October 16, 1998, the ALJ found that Little Rock had pretextually applied its policies to avoid hiring Union members. He also found that "Union applicants were disregarded and were denied the opportunity to apply," rejecting as "not credible and as pretextual the reasons advanced by [Little Rock] for not hiring the discriminatees." *Little Rock Electrical Contractors, Inc.*, Decision, 11-CA-17399 (Oct. 16, 1998) at 7, 9 (the "ALJ Opin-

---

[1]By use of the term "discriminatees" we refer collectively to the Union members who were found in the Board Decision to have been discriminated against.

[2]Specifically, Little Rock challenges subsection (e) of the Board Decision, which mandates that Little Rock cease and desist from "[r]efusing to consider for hire or hire applicants for employment because of their union affiliation or perceived union affiliation." Board Decision at 2.

[3]Little Rock does not contest all the §§ 8(a)(1) and 8(a)(3) violations found in the Board Decision; rather, it challenges only certain violations of § 8(a)(3). An employer engages in an unfair labor practice in violation of § 8(a)(3) if it "discriminat[es] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). If an employer refuses to hire an applicant based on anti-union animus, § 8(a)(3) is violated. *See Wright Elec. v. NLRB*, 200 F.3d 1162, 1168 (8th Cir. 2000).

ion"). On December 10, 1998, Little Rock filed exceptions with the Board to the ALJ Opinion.

On May 11, 2000, while Little Rock's exceptions were pending, the Board issued a related decision establishing a new framework for analyzing claims involving a respondent's discriminatory refusal to consider or hire Union applicants. *FES (A Division of Thermo Power)*, 331 N.L.R.B. No. 20 (2000). The Board's *FES* analysis included a new factor, i.e., whether Union applicants were qualified for the jobs for which they applied. On June 7, 2000, the Board remanded the Little Rock proceeding to the ALJ for further consideration in light of *FES*. *Little Rock Electrical Contractors, Inc.*, Order Remanding Proceeding to Administrative Law Judge, 11-CA-17399 (June 7, 2000) at 2. On remand, the ALJ filed a supplemental decision, concluding, inter alia, that an additional hearing to assess the qualifications of the Union applicants was unnecessary. *Little Rock Electrical Contractors, Inc.*, Decision, 11-CA-17399 (July 26, 2000) at 6 (the "ALJ Supplemental Opinion"). The ALJ Supplemental Opinion also concluded that its first decision had fully satisfied the criteria recognized by the Board in *FES*, and it reaffirmed the ALJ Opinion.

Little Rock then filed exceptions with the Board to the ALJ Supplemental Opinion. On September 28, 2001, the Board affirmed the ALJ's findings, and it adopted the ALJ's proposed Order, with slight modifications. In so doing, it observed that Little Rock had failed to request litigation of the qualifications issue on remand, and it concluded that *FES* did not "require[ ] a hearing on an issue that the Respondent has not raised at any time subsequent to the issuance of *FES*." Board Decision at 1. Little Rock now seeks our review of the Board Decision, challenging certain of the Board's § 8(a)(3) unfair labor practice findings, and maintaining that it was entitled to a hearing on the qualifications of the discriminatees. We possess jurisdiction pursuant to 29 U.S.C. § 160(e).

B.

In 1996, the Tribal Council Gaming Enterprise of the Eastern Band of Cherokee Indians (the "Tribe") contracted with Harrah's N.C. Casino Company, LLC, for the construction, staffing, and operation of a gambling casino in Cherokee, North Carolina (the "Project").

Harrah's then selected Rentenbach Constructors, Inc. ("Rentenbach") as its general construction contractor on the Project, and Rentenbach in turn selected Little Rock as its primary electrical subcontractor.

Little Rock is a non-union electrical contracting company headquartered in Arkansas. In early November 1996, Paul Rhodes, the Business Manager of Local 238 ("Local 238") of the International Brotherhood of Electrical Workers (the "IBEW" or the "Union"), learned that Little Rock had been awarded an electrical subcontract for the Project. The IBEW's Organizing Coordinator, Gary Maurice, then contacted Little Rock's executives, but was unsuccessful in an effort to have the electrical work for the Project performed with Union labor.

One of the requirements of the subcontract between Rentenbach and Little Rock was that, in hiring for the Project, preference was to be accorded to Native Americans.[4] To aid its subcontractors in reaching this goal, Rentenbach scheduled a job fair, to be held on December 7, 1996, in Cherokee, North Carolina (the "Job Fair"). Rentenbach required its subcontractors, including Little Rock, to attend the Job Fair in order to receive application forms and speak with applicants. Indeed, Rentenbach, by letter of November 25, 1996, specifically advised Little Rock that "maximizing Indian participation is a requirement of this project. Your adherence to Indian preference policies, and your participation in this Expo, are required as a condition of your pending contract."[5]

---

[4]The contract between the Tribe and Harrah's required Rentenbach to give preference to Native American contractors and labor "to the fullest extent practicable." This preference was incorporated into the subcontract between Rentenbach and Little Rock.

[5]Rentenbach's letter of November 1996 also mandated the use of preprinted Rentenbach application forms at the Job Fair, setting up a procedure at a registration area where

> attendees will be asked to fill out the appropriate application (employment, subcontractor, or supplier). Applications will then be reviewed and the applicant referred to the appropriate craft tables set up for "mini interviews." We have already had applications printed for use by your firm, copies of which are attached for your review.

The letter concluded, "[w]e trust that each of us will gain some valuable information during the Expo as to labor and subcontractor/supplier availability."

Although the Job Fair was initially intended to be for Native Americans only, Rentenbach soon became concerned that this limitation might create legal problems. It therefore opened the Job Fair to the general public, advertising in a Cherokee newspaper, and on the local television cable channel, between November 22, 1996, and December 7, 1996. Additionally, Rentenbach faxed Local 238 a written notification of the Job Fair, advising that it was being held to "interview[ ] for construction opportunities for the . . . casino," and asking the Local to "[p]lease plan to attend." Local 238 then notified other IBEW Locals of the Job Fair, and it also solicited potential applicants to attend.

On December 7, 1996, approximately thirty-seven Union members travelled to the Job Fair to apply for work in a "salting" process, i.e., they were seeking work on a non-union project for organizational purposes. The Union members either wore clothing indicating their Union affiliation, indicated their Union memberships on their application forms, or both. Thirty-six of the Union members (the "Job Fair Applicants") filled out the "Harrah's Cherokee Casino Construction Project Application for Employment," a Rentenbach-prepared form (the "Job Fair Application"). After completing their applications, the Job Fair Applicants were directed to the Little Rock table at the Job Fair, where Little Rock's Vice President, Willie Godwin, and its Project Manager, Bobby Howell, were conducting "mini-interviews." Godwin and Howell indicated to several of the Job Fair Applicants that their applications would be kept on file for future hiring. Little Rock then returned all of the Job Fair Applications to Rentenbach, which kept them on file for future use by the subcontractors.

According to Little Rock, it believed that the purpose of the Job Fair was only to survey available Native Americans, and, as a consequence, it did not take to the Fair either its own application forms or copies of its hiring policy.[6] According to Howell, Little Rock utilized the Job Fair Applications only for the purpose of hiring Native Americans, disregarding the others. Little Rock did not, however, inform the Job Fair Applicants that it would not consider their applications.

---

[6]Little Rock also maintains that, pursuant to its hiring policy, it only accepted job applications "when we [knew] there [were] jobs available," and that it refused to accept "group applications or photocopied forms."

Furthermore, it failed to advise them that, in order to properly apply for employment, it would be necessary to submit additional job applications directly to Little Rock.

Over two hundred persons attended the Job Fair, and a total of 177 employment applications were completed. Eighty of the applicants were Native Americans, and thirty-six were the Job Fair Applicants. As the Union members were leaving the Job Fair, a Rentenbach representative provided the Local 238 Business Manager with blank Job Fair Application forms and invited their completion by those unable to attend the Job Fair, requesting that they be mailed back to her. For the same purpose, the Rentenbach representative later gave blank Job Fair Applications to the business managers of Locals 342 and 379.

On December 26, 1996, the Union's Organizing Coordinator, Gary Maurice, sent Little Rock a letter that, inter alia, inquired whether the Job Fair Applications were being considered by Little Rock. Because Godwin and Howell had informed some IBEW members that the Job Fair was only conducted as a courtesy to the Tribe, and because they had told others "that the [Job Fair Applications] were valid applications for employment and would be valid for the entire project," ALJ Opinion at 6, Maurice sought confirmation that these applications were viable. He requested that "[i]f this is not true or if this procedure has been changed, please notify us immediately." Little Rock failed to respond to this inquiry, and the Job Fair Applicants were not notified that, in the absence of completing a separate Little Rock application, they would not be considered for employment.

In January 1997, Little Rock set up its construction trailer at the Project and began interviewing and hiring applicants. At first, it accepted job applications freely, but Howell soon posted a "not hiring" sign on the door of the construction trailer. Howell's procedure for hiring was to identify probable hires and advise them to apply within a two-hour window (usually on a weekend), during which he covered the "not hiring" sign. During the hiring process, Union members who travelled to the Project to seek employment were advised to check instead with Rentenbach. Indeed, the Little Rock secretary at its construction trailer informed Union members on at least three occasions that its hiring procedure was to obtain employment applications from Rentenbach as they were needed. The ALJ found, how-

ever, that despite these representations, Howell (one of the secretary's supervisors) admitted that "the job fair applications were used solely to hire native Americans." ALJ Opinion at 6.

On January 16, 1997, the Business Manager of Local 238 mailed twenty completed Job Fair Applications to Rentenbach, sending copies to Little Rock by certified mail.[7] By letter of January 27, 1997, Little Rock acknowledged receipt of the mailed applications, but it advised Local 238 that "[w]e are not accepting applications at this time," enclosing a copy of its hiring policy. At both the Job Fair and thereafter, Little Rock refused to consider any direct employment applications, sending applicants to Rentenbach or contacting pre-approved potential hires to inform them when their applications would be accepted.[8]

## II.

We review the Board's findings of fact only to assess whether they are supported by substantial evidence in the record as a whole.[9] *See*

[7]The ALJ included Union member James Tolley in his list of those applying by mail, but, on appeal, the Board was unable to locate his application, nor is there evidence in the record regarding his status. Little Rock did not challenge this finding before the Board and the issue of his status is raised for the first time here. We need not consider this point, however, in view of the mandate of section 10(e) of the Act that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e).

[8]Little Rock also failed to hire Jamie D. Brown, the only applicant who was both an enrolled Cherokee and a Union member, despite the fact that he applied both at the Job Fair and at the Project. In fact, only twenty of the seventy-three employees hired by Little Rock on the Project were Native Americans. Little Rock did not hire any openly identified Union members who applied at the Job Fair, who mailed their applications, or who visited the Project to apply or reapply.

[9]We review the Board's determinations, rather than those of the ALJ, because "[t]he Board, not the ALJ, is ultimately vested with the responsibility for determining whether an unfair labor practice has been committed." *Am. Thread Co. v. NLRB*, 631 F.2d 316, 320 (4th Cir. 1980).

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Diesel Co. v. NLRB*, 263 F.3d 345, 351 (4th Cir. 2001). Where the Board has chosen between two possible views of the evidence, we cannot displace that choice, even if we would have chosen otherwise in the first instance. *Universal Camera*, 340 U.S. at 488. In reviewing legal conclusions, we defer to the Board's interpretation of the Act "so long as its reading is a reasonable one." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996).

## III.

In its petition for review, Little Rock challenges the Board's determination that it refused to consider or hire applicants because of their actual or perceived Union affiliation. It also contends that, pursuant to the Board's *FES* decision, it was entitled to a hearing before the ALJ on the employment qualifications of the alleged discriminatees.[10] We will examine each of these contentions under the *FES* framework.[11]

---

[10]Little Rock also contends that the Board erred in finding that its hiring practices were inherently destructive. Petitioner's Br. at 1. The Board, however, specifically declined to decide whether the hiring procedures were inherently destructive, concluding instead that Little Rock's reasons for refusing to hire the Union members were pretextual. Thus, there is no Board finding on inherent destructiveness for us to review.

[11]The Board Decision also mandated that Little Rock cease and desist from, inter alia:

(a) Advising employees that the Respondent changed its hiring policy in order to avoid accepting employment applications and or hiring employees associated with the Union.

(b) Promulgating and maintaining a rule prohibiting employees from discussing the Union while permitting the discussion of other nonwork related topics during working time.

(c) Advising employees that it is futile to support the Union.

(d) Interrogating applicants for employment concerning their Union activities.

Board Decision at 2. Little Rock has not challenged the foregoing portions of the Board Decision, which relate to violations of both §§ 8(a)(1)

By its *FES* decision of May 11, 2000, the Board established a three-part test to be utilized in the assessment of § 8(a)(3) refusal-to-hire unfair labor practice claims. Pursuant thereto, the Board's General Counsel is required to demonstrate: (1) that the respondent was hiring, or had concrete plans to hire, when the alleged unfair labor practices occurred; (2) that the applicants possessed the relevant experience or training; and (3) that anti-union animus contributed to the decisions not to hire the job applicants. If this test is met, the burden of proof shifts to the respondent, in this instance, Little Rock, to show that it would not have hired the applicants in any event.

A.

Little Rock maintains that it cannot be found to have contravened the first prong of *FES*. According to Little Rock, "[a]t the time of the Job Fair, there were no openings for the Harrah's Casino Project because work had not yet commenced and [Little Rock] was confident it could staff the Project with its own people." Petitioner's Br. at 8. To the contrary, Little Rock expected to hire fifty electricians on the Project, and it ultimately hired seventy-three electricians. Only five or six of these electricians had worked for Little Rock previously. Little Rock further asserts, however, that it could not have been hiring for the Project because it had no contractual arrangement with Rentenbach at the time of the Job Fair. This assertion borders on specious. While its written contract with Rentenbach was not executed until *after* completion of the Project, Little Rock has also maintained that it only attended the Job Fair because it was *contractually required* to do so. Petitioner's Br. at 5, 8. In this circumstance, where Little Rock has presented conflicting positions to the Court, the Board's finding that Little Rock had in fact been awarded the Project subcontract, and that it intended to hire electrical workers when the Job Fair took place, are amply supported by the evidence.

---

and 8(a)(3). And as Judge Hall succinctly observed several years ago, "the Company cannot contest certain charges in a vacuum by not contesting others. The unchallenged violations remain in the case, 'lending their aroma to the context in which the issues are considered.'" *NLRB v. Frigid Storage*, 934 F.2d 506, 509 (4th Cir. 1990) (quoting *NLRB v. Clark Manor Nursing Home Corp.*, 671 F.2d 657, 660 (1st Cir. 1982)). Because these findings are uncontested, we are obliged to enforce those aspects of the Board Decision which relate to them. *Id.*

B.

The second prong of *FES* requires that the discriminatees possess experience or training relevant to the announced or generally known requirements of the employment positions, that the respondent did not uniformly adhere to those requirements, or that the requirements themselves were used as a pretext for discrimination. Little Rock contends that, pursuant to *FES*, it was entitled to an evidentiary hearing before the ALJ on the qualifications of the discriminatees. On remand, however, Little Rock failed to request the ALJ to accord it an opportunity to litigate these issues.

Following the *FES* decision, the Board remanded this case to the ALJ, with directions that it be reconsidered in light of *FES*, and with the further directive that ALJ should reopen the record "*if necessary*." *Little Rock Electrical Contractors, Inc.*, Order Remanding Proceeding to Administrative Law Judge, 11-CA-17399 (June 7, 2000) at 2. When the ALJ invited the parties to address *FES*, Little Rock did not seek to reopen the record, and it did not contend on remand that the discriminatees were less qualified than the employees it had hired. Rather, it confined its contentions to the existing record. The issue of the qualifications of the discriminatees was thus not raised on remand to the ALJ; it was only thereafter raised before the Board, which refused to consider it. Board Decision at 1. Importantly, we find nothing to suggest that reopening of the administrative record here would have permitted Little Rock to demonstrate that the discriminatees were unqualified. In these circumstances, we are unable to find an abuse of discretion, because a refusal to reopen an administrative record does not constitute an abuse of discretion "unless it clearly appears that the new evidence would compel or persuade to a contrary result." *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1285 n.10 (D.C. Cir. 1999) (internal citation and quotation omitted); *NLRB v. Amalgamated Clothing & Textile Workers Union, AFL-CIO*, 662 F.2d 1044, 1045 (4th Cir. 1981).

C.

The final prong of the *FES* inquiry relates to whether anti-union animus contributed to Little Rock's decisions not to hire the discriminatees. Little Rock maintains that its refusal to hire the discriminatees

at the Job Fair cannot be attributed to discrimination against the Union, because it did not hire any non-Union, non-Native-American applicants at the Job Fair. However, the Board agreed with the ALJ's finding that Little Rock's "reasons for not hiring the discriminatees were pretextual," Board Decision at 1, and this finding is supported by substantial evidence.

First, Little Rock failed to inform the Job Fair Applicants that it was necessary for them to complete another job application form before they would be considered for employment. Importantly, Little Rock also failed to respond to the letter of Gary Maurice (the Union Organizer) of December 26, 1996, setting forth his understanding that the Job Fair Applications were in proper form and requesting immediate notification if they were not.[12] Little Rock, in failing to respond to this request, perpetuated a reasonable belief of the discriminatees (1) that they had properly applied for employment with Little Rock and, (2) that they were under consideration for jobs on the Project. Moreover, when Union applicants visited the Project, they were advised that Little Rock was not hiring — even when Little Rock hired employees that very day. Such evidence amply supports the Board's finding that Little Rock manipulated its "neutral" hiring practices in order to exclude Union applicants from consideration. Given the "aroma" created by such conduct, the record supports the Board's finding that the Union applicants were discriminated against.

Little Rock engaged in similar anti-union discrimination in its refusal to consider the mailed-in applications. Little Rock did *not* indicate to the discriminatees that the mailed-in applications violated its hiring policy. After receiving the group applications, Little Rock informed Local 238, by letter of January 27, 1997, that "we are not accepting applications at this time." In so doing, Little Rock furthered its discriminatory efforts against Union applicants, misleading the dis-

---

[12]Although neither the ALJ nor the Board chose to rely upon this letter in connection with their decisions, we believe its contents to be pertinent. And we are required to review the entire record in assessing whether the Board Decision is supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951).

criminatees into believing that the Job Fair Applications were valid applications for Little Rock employment.[13]

IV.

Pursuant to the foregoing, we deny Little Rock's petition for review and grant the Board's cross-application for enforcement.

*PETITION FOR REVIEW DENIED AND*
*CROSS-APPLICATION FOR ENFORCEMENT GRANTED*

---

[13]Despite the contractual preference for Native Americans and the avowed purpose of the Job Fair to identify Native American applicants, Little Rock refused to either interview or hire Jamie D. Brown, the only Native American applicant who was also a Union member. Significantly, Brown's application to Little Rock indicated both that he was Native American and that he was a member of the IBEW. In the context of Little Rock's other conduct on the Project, the Board was entitled to determine that Brown was discriminated against due to his Union affiliation. Board Decision at 1 & n.3.