# IN THE COURT OF APPEALS OF IOWA

No. 23-1368
Filed October 2, 2024

**INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL 1366,**
    Petitioner-Appellee,

**vs.**

**CITY OF CEDAR FALLS,**
    Respondent-Appellant,

**and**

**IOWA PUBLIC EMPLOYMENT RELATIONS BOARD,**
    Respondent.
_____

Appeal from the Iowa District Court for Polk County, Joseph Seidlin, Judge.

The City of Cedar Falls appeals the district court's reversal of the Iowa Public Employment Relations Board's remedy order in a contested case. **AFFIRMED AS MODIFIED AND REMANDED.**

Andrew Tice of Ahlers & Cooney, P.C., Des Moines, for appellant.

David Ricksecker (pro hac vice) and Matthew D. Purushotham (pro hac vice) of McGillivary Steele Elkin LLP, Washington, DC, and Mark T. Hedberg of Hedberg & Boulton, P.C., Des Moines, for appellee.

Brenna Bird, Attorney General, and Breanne A. Stoltze, Assistant Solicitor General, for respondent Iowa Public Employment Relations Board.


Heard by Tabor, C.J., and Chicchelly and Sandy, JJ. Langholz, J., takes no part.

**SANDY, JUDGE.**

The International Association of Firefighters, Local 1366 (the Union) filed a prohibited practice complaint against the City of Cedar Falls (the City) after its city council passed a resolution to fully transition to a public safety officer (PSO) program to provide traditional police officer and firefighter services. The passage of the resolution led to eight traditional firefighters represented by the Union being placed on administrative leave pending layoff.

An administrative law judge (ALJ) issued a proposed decision finding the City committed a prohibited practice in violation of Iowa Code section 20.10(2)(a), (b), and (d) (2020) by placing the traditional firefighters on "administrative leave pending layoff." The ALJ's proposed decision was appealed to the Iowa Public Employment Relations Board (PERB). PERB adopted the ALJ's decision and expressly adopted her findings of fact and conclusions of law in full. Yet, in a remedy order, PERB determined that damages resulting from the layoff were inappropriate because the layoff was not a prohibited practice.

The Union petitioned for judicial review, asserting that PERB erred in its remedy order by finding damages resulting from the layoff were inappropriate. The district court agreed with the Union, finding PERB's remedy order to be "clearly erroneous, illogical, and irrational" for determining that the layoff was not a prohibited practice. The district court remanded the matter to PERB to fashion an appropriate remedy addressing the layoff.

The City appeals the district court ruling, arguing that the district court erred by reversing PERB's determination of remedial relief in a contested case. After careful review of the record, we find PERB violated Iowa Code

section 17A.19(10)(i) (2023) by issuing such internally inconsistent rulings that they are irreconcilable. Accordingly, we affirm the district court's ruling as modified and remand the matter to the Iowa Employment Appeal Board to fashion an appropriate remedy addressing the layoffs.

## I.      Factual Background

Since at least 1995, the City has experimented with alternative methods of providing traditional police and firefighter services for its citizens. This experimentation began with the creation of a police officer reserve program in 1995. A decade later the City took another step in the direction of providing alternative police and firefighter services by starting the "Paid on Call" (POC) program. The POC program permitted the City's employees from other departments to cross-train and apply for positions as firefighters or police officers. According to the City, the POC program was a resounding success. The City claims its citizens noticed "more police on patrol and significantly more firefighters responding to a fire incident." And the City believed the POC program presented promising potential to deliver traditional police and firefighting services to its citizens in a more cost-effective manner.

Spurred by the success of the POC program, the City began further investigating other ways to provide traditional police and firefighter services to its citizens. In a sign of things to come, the Chauffeurs, Teamsters & Helpers Local 238—the union representing the City's police officers—amended its bargaining unit description to add the position of "police officer/firefighter" in 2009. And a year later, the City began consulting other cities across the nation that utilized cross-trained police officers and firefighters. The City believed that a PSO model—

exclusively utilizing cross-trained police officers and firefighters—would deliver its citizens even more cost savings and operational efficiencies.[1]

Beginning in 2014, the City began a fundamental reorganization of its public safety department. That year, the City officially launched the PSO program. Around the same time, the City and the police union agreed on a public safety officer job classification and included the position in the police union's collective bargaining agreement. In 2016, the City announced all new hires in the public safety department were required to be cross-trained PSOs. The City also created the public safety director position to oversee the public safety department. Jeff Olson has served as the director of the public safety department since the position's inception.

The City has been open with its intentions of transitioning to a PSO model to provide traditional police and firefighter services. Over the years, the city council has published several memorandums identifying the City's goals in transitioning to a PSO model. In a memorandum for fiscal year 2016, the city council expressly stated that it wanted to "[e]xpand the City's Paid-on-Call (POC) program and other cross-training programs such as a PSO program." In a similar memorandum for fiscal year 2018, the city council stated it wished to "[i]ncrease the number of alternative staff in police and fire." And in a memorandum for fiscal year 2019, the city council stated its goal was to "[e]xpand the use of PSO's and PCO's to adequately staff fire stations without adding full-time staff or overtime expenses." At the same time, in several city council meetings in the fall of 2019, Director Olson

---

[1] The record discloses the City believes the full implementation of the PSO model would save the City nearly $2 million per year.

made it clear the City had no intention of laying off traditional firefighters. Director Olson even said that there "will always be" full-time firefighters.

To carry out the transition to a PSO model, the City relied on a system of attrition. As traditional police officers and firefighters either resigned or retired, they would be replaced by cross-trained PSOs. But this gradual transition to the PSO model was not without its challenges. The traditional firefighters remaining in the City's public safety department often voiced safety concerns they had with the implementation of the PSO program. Some of the traditional firefighters took to social media to express their safety concerns with the PSO program. The record discloses that the traditional firefighters and PSOs in the fire division seldom got along. Director Olson received many complaints from PSOs in the fire division concerning harassment and the creation of a hostile work environment by traditional firefighters. As one city council member put it, the traditional firefighters and PSOs "are like oil and water."

The year 2020 marked a turning point for the transition to the PSO program. On February 17, the city council conducted a work session, at which Director Olson made a presentation on the current state of the City's PSO program. During his presentation, Director Olson advised the city council it had three options with the PSO program. According to Director Olson, the city council could move forward with a full implementation of the PSO model, modify the current PSO model, or return to separate police and fire departments. At this time, there were only eight

traditional firefighters—excluding management—left in the public safety department. All eight were represented by the Union.[2]

After Director Olson concluded his presentation, the city council discussed the PSO program. One city council member asked Director Olson if the reason the traditional firefighters and the Union were against the program was because the firefighters did not want to be subjected to higher standards of testing, such as a polygraph test. Another City Council member expressed frustration with the Union's "absolute unwillingness" to work with the City on the PSO program. And one city council member stated, in an apparent reference to the traditional firefighters and the Union, "we know why this doesn't work." Several city council members also expressed frustration with the fact the Union had filed at least twenty-five grievances against the City over the past few years. At the end of this work session, Councilman Mark Miller called for a special meeting to be held on February 20.

At the special meeting, the city council exclusively discussed the implementation of the PSO program. Director Olson again presented several options to the city council for implementing the PSO program. One of the options Director Olson discussed was the immediate implementation of the PSO program. This option required eliminating all employees in the traditional firefighter position. After extensive public comments, Councilman Miller asked Director Olson whether the City had adequate staffing to transition fully to the PSO model. Director Olson

---

[2] The record discloses fire division management was not a part of the Union's bargaining unit.

responded that the City had adequate staffing to move forward with a complete transition to the PSO model.

The city council then voted to adopt resolution 21,893—authorizing the immediate implementation of the PSO program. After resolution 21,893 was passed, the city council held a brief discussion. During this discussion Councilman Miller stated, "[w]e don't have the option of speaking about union issues, so I've essentially been biting my tongue for a long while." Councilman Miller added that he understood the "optics of what this looks like," but he claimed the city council was not engaging in "union busting" by passing the resolution. Councilman Miller also expressed frustration that the City was not getting cooperation from the Union in implementing the PSO program.

The next day, Cedar Falls Mayor Rob Green vetoed resolution 21,893. In his veto memorandum, Mayor Green expressed his concerns with the city council's process in adopting the resolution. Mayor Green asserted the city council failed to "follow basic principles of good governance" in passing the resolution at the special meeting. Mayor Green noted the special meeting "allowed staff less than two working days to prepare presentation, engage stakeholders, and obtain critical feedback on a plan [that] called for departmental reorganization and expected staff layoffs."

But on March 2, at a regularly scheduled meeting, the city council voted to override Mayor Green's veto of resolution 21,893. After the vote, Councilman Nick Taiber stated the City had difficulty garnering support for the PSO program because the Union's leaders would not give their support. Councilman Taiber believed the Union's resistance to the PSO program "can't be overstated."

Following the city council's vote to override his veto, Mayor Green issued a memorandum to announce the creation of a transition task force. The task force was instructed to provide recommendations for equitable outcomes for the "former firefighters displaced as a result" of resolution 21,893. It was then that the eight traditional firefighters—all of whom were members of the Union—were placed on administrative leave with pay.

The transition task force provided three recommendations for the eight traditional firefighters impacted by the full implementation of the PSO model. The traditional firefighters could apply to become a cross-trained PSO, apply for another position within the City, or accept a severance package.[3] If the traditional firefighters elected not to take any of these three options, they would be laid off effective June 22, 2020. On March 16, the city council passed resolution 21,918, which adopted the recommendations for the traditional firefighters provided by the transition task force. Of the eight traditional firefighters, five opted to accept the severance package the City offered, one opted to transition to a PSO position, one was promoted to fire captain, and one was laid off.

## II.    Procedural Background

On April 2, 2020, the Union filed a prohibited practice complaint against the City with PERB. Among other things, the Union asserted the City committed a prohibited practice in violation of several paragraphs of Iowa Code section 20.10(2) by placing the traditional firefighters on administrative leave pending the elimination of the firefighter position. *See* Iowa Code § 20.10(2)

---

[3] The severance agreement offered by the City included a provision in which the traditional firefighters would waive all potential claims against the City.

(2020) (defining actions by public employers that constitute a prohibited practice).[4] PERB assigned an ALJ to preside over the matter, and an evidentiary hearing was held on February 24, 2021.

In her written proposed decision, the ALJ determined the City committed a prohibited practice by placing the traditional firefighters on "administrative leave pending layoff" in violation of Iowa Code section 20.10(2)(a), (c), and (d). As the ALJ reiterated several times in her proposed decision, "[t]he issue is whether the City had a legitimate motive to place the bargaining unit employees on administrative leave pending layoff as a result of its implementation of the PSO program." Utilizing the dual-motive test formulated in *National Labor Relations Board v. Wright Line*, 662 F.2d 899, 901–02 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982), the ALJ reasoned the City's actions were motivated by union animus based on the comments of city council members, the disparate treatment of traditional firefighters, and the abrupt departure from past practice regarding the implementation of the PSO program. *See Cerro Gordo Cnty. v. Pub. Emp. Rels. Bd.*, 395 N.W.2d 672, 677 (Iowa Ct. App. 1986) (finding a county committed a prohibited practice in violation of Iowa Code section 20.10(2) because the county's decision to discharge an employee was motivated by union animus).

The City then appealed the ALJ's proposed decision to PERB. PERB expressly adopted the ALJ's factual findings and conclusions of law. PERB also

---

[4] In its prohibited practice claim, the Union also asserted the City committed violations of Iowa Code section 20.9(1) by implementing unilateral changes to "in-service training," "job classifications," and "procedures for staff reduction." As such claims are not the subject of the instant appeal, we do not address them in this opinion.

added some additional commentary concerning the ALJ's legal conclusions, but such commentary did not otherwise alter the ALJ's legal conclusions. PERB then ordered the City and the Union to meet to come to terms on an appropriate remedy. But after the City and the Union could not come to terms on an appropriate remedy, PERB then issued a remedy order.[5] In its remedy order, PERB found that damages resulting from the layoff would be inappropriate "[b]ecause the final layoff on June 22, 2020, was not determined to be a prohibited practice." PERB determined the appropriate remedy was a cease-and-desist order.

Believing that the agency incorrectly denied its requests for remedies stemming from the layoff of the traditional firefighters, the Union petitioned for judicial review. The Union contended the agency erred in fashioning a remedy because it incorrectly determined the layoff was not found to be a prohibited practice. The district court agreed, finding the agency's decision that the layoffs were not found to be a prohibited practice was "clearly erroneous, illogical, and irrational." Therefore, the district court remanded the matter back to the agency to fashion an appropriate remedy addressing both the placement of the firefighters on administrative leave and the layoff.

The City now appeals the district court's ruling, contending the district court erred in reversing the agency's determination of remedial relief.

**III.    Standard of Review**

Judicial review of agency action is controlled by Iowa Code chapter 17A (2023), applying the standards found in Iowa Code section 17A.19(10). *Pohl v.*

---

[5] In briefing to PERB on the issue of an appropriate remedy, the Union argued reinstatement, back pay, and the restoration of benefits were appropriate here.

*Univ. of N. Iowa*, No. 23–0426, 2024 WL 960918, at *5 (Iowa Ct. App. Mar. 6, 2024). The applicable standard of review differs depending on the nature of the error alleged by a party. *Env't L. & Pol'y Ctr. v. Iowa Utils. Bd.*, 989 N.W.2d 775, 781 (Iowa 2023). A party's challenge to an agency's factual findings or sufficiency of the evidence is subject to substantial evidence review. *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 256 (Iowa 2012). A party's challenge to an agency's application of law to fact is subject to a deferential standard of review, and we are to reverse only if the agency's action is irrational, illogical, or wholly unjustifiable. *Env't L. & Pol'y Ctr.*, 989 N.W.2d at 781; *see also* Iowa Code § 17.19(10)(i), (m).

In reviewing a district court's decision on a petition for judicial review invoking the standards set forth in section 17A.19(10), we examine whether we would reach the same conclusion as the district court. *Eyecare v. Dep't of Hum. Servs.*, 770 N.W.2d 832, 835 (Iowa 2009). "The petitioner challenging agency action has the burden of demonstrating the prejudice and invalidity of the challenged agency action." *Colwell v. Iowa Dep't of Hum. Servs.*, 923 N.W.2d 225, 231 (Iowa 2019) (citing Iowa Code § 17A.19(8)(a)).

## IV. Analysis

### A. Challenges Based on Iowa Code section 17A.19(10)(*l*)

We read the City's briefing to assert three related arguments that the district court applied the wrong standard of review in its decision. Thus, we believe this a logical point to begin our analysis.

The City asserts the district court incorrectly applied Iowa Code section 17A.19(10)(*l*) in its decision reversing PERB's remedy order. Section 17A.19(10)(*l*) provides that an agency decision may be reversed if it is

"[b]ased upon an irrational, illogical, or wholly unjustifiable interpretation of a provision of law whose interpretation has clearly been vested by a provision of law in the discretion of the agency."

In its first argument for why section 17A.19(10)(*l*) should not have been applied by the district court in its analysis, the City notes that the Iowa Administrative Procedure Act contains a strict pleading standard to preserve issues for review in agency action cases. *See* Iowa Code § 17A.19(4) (listing the requirements a petition for judicial review of agency action must meet). Our supreme court has stated the pleading requirements of section 17A.19(4) are met when each alleged error is separately and distinctly stated so that the other party is sufficiently notified of the alleged error. *See Off. of Consumer Advoc. v. Iowa State Com. Comm'n*, 419 N.W.2d 373, 375 (Iowa 1988). Additionally, our supreme court has emphasized that the party opposing a petition for judicial review of an agency action "is entitled to know the exact nature of the claimed errors, and each error must be separately and distinctly stated so an opponent can adequately prepare and respond to the issues being reviewed." *Kohurst v. Iowa State Com. Comm'n*, 348 N.W.2d 619, 621 (Iowa 1984). From these principles, the City argues that judicial review of agency actions must be limited to the "exact nature of the claimed errors" by the petitioning party.

Building off this reasoning, the City argues the district court exceeded the permissible scope of its limited review by analyzing the Union's claims under section 17A.19(10)(*l*). As the City points out to us, the Union neither pleaded nor asserted a claim under section 17A.19(10)(*l*) in the district court. The City further notes the Union only pleaded and asserted claims under section 17A.19(10)(f), (h),

(i), and (n).[6]  Thus, the City claims the district court erred in analyzing the Union's claim under section 17A.19(10)(*l*) because it was not one of the errors pleaded by the Union.

The City also argues section 17A.19(10)(*l*) is inapplicable in this case because this case does not involve "interpretation of a provision of law."  We concede what precise paragraph of section 17A.19(10) the district court based its decision on is unclear.  We agree with the City that if the district court made its ruling under paragraph (*l*) error occurred because no "interpretation of a provision of law" is at issue.  However—without deciding whether the district court incorrectly applied section 17A.19(10)(*l*)—we may affirm the district court on an alternative ground that is supported by the record and urged by the prevailing party.  *See Hawkeye Foodservice Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 609 (Iowa 2012).

Thus, the relevant question is, did the agency violate a paragraph of section 17A.19(10) that was pleaded by the Union?  As we explain below, it did.

**B. Does section 17A.19(10)(i) provide an adequate alternative ground?[7]**

The agency found "overwhelming" evidence of union animus by the City that led to its decision to "place the firefighters on administrative leave pending layoff"

---

[6] As the City points out, the Union originally pleaded claims for relief under section 17A.19(10)(c) and (e) but later withdrew these claims.

[7] The Union also asserts we can affirm the district court's decision under section 17A.19(10)(f) and (h).  Section 17A.19(10)(f) provides that courts may reverse an agency action that is "not supported by substantial evidence in the record."  Section 17A.19(10)(h) provides a court may reverse an agency action that is "inconsistent with the agency's prior practice or precedents."  Even so, we believe section 17A.19(10)(i) is more on point because we read the Union's

rendering it a prohibited practice. Yet the agency determined the City's decision to lay off the firefighters was not a prohibited practice. Implicit in the City's argument and the district court ruling is that both assume the agency ignored its own internally inconsistent decision in an irreconcilable manner. But the City argues the agency knows best the determination it made when rendering its ruling.[8] On the unique facts of this case, we find the Union's argument more persuasive.

No prior Iowa case law exists further defining "reasoning that is so illogical as to render it wholly irrational." Iowa Code § 17A.19(10)(i). Based on the facts before us, that task is now ours.

When a statute or rule is plain and its meaning is clear, the rules of statutory construction do not permit courts to search for meaning beyond its express terms. *State v. Snyder*, 634 N.W.2d 613, 615 (Iowa 2001). We generally presume words contained in a statute are used in their ordinary and usual sense with the meaning commonly attributed to them. *Am. Home Prods. Corp. v. Iowa State Bd. of Tax Rev.*, 302 N.W.2d 140, 143 (Iowa 1981). When not defined in a statute, we construe a term according to its accepted usage.

Here, "reasoning that is so illogical as to render it wholly irrational" would be reasoning that is so internally inconsistent so as to make it irreconcilable. While our judicial power does not confer authority to substitute our judgement for that of

---

argument to essentially claim the agency erred in determining that damages resulting from the layoffs were inappropriate based on flawed reasoning that the layoffs were never found to be a prohibited practice. Thus, we decline to address the Union's arguments invoking section 17A.19(10)(f) and (h).

[8] The City also claims the district court should not have resorted to canons of statutory interpretation to substitute its judgment for the agency.

the agency, it is the agency that disagrees with itself. *Cf. Christensen v. Snap-On Tools Corp.*, No. 01-1734, 2003 WL 1024942, at *3 (Iowa Ct. App. Mar. 12, 2003).[9] The agency adopted the ALJ's findings in full to include "administrative leave pending layoff" as a prohibited practice. The agency also determined that a layoff is not a prohibited practice.[10] Such conclusions are so internally inconsistent as to make them irreconcilable, and we are unable to find any explanation (logical or otherwise) within this record explaining the inconsistency. In this way the agency's findings were "[t]he product of reasoning that is so illogical as to render it wholly irrational." *See* Iowa Code § 17A.19(10)(i).

Moreover, if placing the traditional firefighters on administrative leave was a prohibited practice, we fail to see how the later layoffs were not also a prohibited practice. And the City offers no cogent explanation otherwise. Certainly, a layoff is more serious than leave. The evidentiary record and resulting analysis by the

---

[9] *Christensen* stated,

> A rational person certainly could, on this record, find Christensen sustained a disability greater than ten percent. However, after a careful review of the record, we cannot say the agency's decision is so illogical or irrational as to permit the court on judicial review to dictate a different outcome. The legislature's grant of judicial power to reverse an agency decision that is the "product of reasoning . . . so illogical as to render it wholly irrational," Iowa Code section 17A.19, did not confer upon courts wholesale authority to substitute their judgment for that of agencies whenever courts might favor a different outcome in a contested case. After a careful review of the record, we are unable to conclude that the agency's decision is so wholly irrational as to mandate reversal in this case. Accordingly, we affirm.

2003 WL 1024942, at *3 (alteration in original).

[10] The "pending layoff" language used by the agency makes sense when it considered that, at the time of the filing of the Union complaint, the firefighters were placed on administrative leave pending layoff. From their complaint, it was clear the firefighters were complaining about the City's decision to not only place them on administrative leave, but to place them on administrative leave *pending layoff*.

agency apply with indistinguishable equal force to both leave and layoff. The City's obfuscation of such in its attempts to categorize different outcomes—severance agreements versus termination—is a distinction without a meaningful analytical difference.

We recognize that agencies enjoy deference in their decisions. *See Bridgestone/Firestone v. Accordino*, 561 N.W.2d 60, 62 (Iowa 1997) (noting appellate courts are "obliged to broadly and liberally construe an agency's factual findings so as to uphold, rather than defeat, the agency's decision"). But we have previously overturned final agency actions that are so internally inconsistent that they are irreconcilable with other agency orders in the same case. *See Babka v. Iowa Dep't of Inspection & Appeals*, 967 N.W.2d 344, 346 (Iowa Ct. App. 2021) (reversing a final agency action that was internally inconsistent to the point it was irreconcilable).

Therefore, the agency's conclusions are so internally inconsistent they are irreconcilable and thus "[t]he product of reasoning that is so illogical as to render it wholly irrational" in violation of Iowa Code section 17A.19(10)(i).

## V. Conclusion

For the reasons set forth above, we hold the agency's decision in its remedy order to deny the Union firefighters' request for damages resulting from the layoff violated Iowa Code section 17A.19(10)(i). Accordingly, we believe the district court correctly reversed the agency's decision in its remedy order.

We thus affirm the judgment of the district court as modified and remand to the district court with instructions to remand to the Iowa Employment Appeal Board[11] for purposes of fashioning a remedy consistent with this opinion.

**AFFIRMED AS MODIFIED AND REMANDED.**

---

[11] *See* 2024 Iowa Acts ch. 1170, § 513.4(f).